**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **COINME INC.,** | |
| Plaintiff, | Case No.: 1:24-cv-10972 |
| v. | |
| **ZERO HASH LLC,** | **JURY DEMANDED** |
| Defendant. | |

**COMPLAINT**

Plaintiff Coinme Inc. ("Coinme"), through its attorneys for causes of action against Defendant Zero Hash LLC ("Zero Hash"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for breach of contract and in tort in which Zero Hash brazenly and willfully violated its promise to Coinme to stay away from its customers and intellectual property.

2.      Coinme is a cryptocurrency company with two business models: (i) a business-to-business ("B2B") cryptocurrency trading platform for other companies, including Coinstar Asset Holdings, LLC ("Coinstar") and MoneyGram Payment Systems, Inc. ("MoneyGram"), and (ii) a business-to-consumer ("B2C") platform that allows consumers to buy and sell cryptocurrency in the Coinme smartphone application and at physical locations.

3.      Zero Hash is a competitor to Coinme; it does not have its own smartphone application, but it develops B2B cryptocurrency trading platforms for other companies, including Draft Kings, Stripe, and Franklin Templeton.

1

4.     Despite their competitive relationship, Coinme and Zero Hash saw an opportunity in late 2019 to work together to expand Coinme's business in certain states in the United States.

5.     By working together, Zero Hash and Coinme could provide cryptocurrency exchange services to customers in states where Coinme was not yet operating.

6.     However, because they were competitors, Coinme was worried that Zero Hash would attempt to steal Coinme's customers after Coinme ended its business relationship with Zero Hash.

7.     After they entered their business relationship, Coinme asked Zero Hash if they could amend their contracts to protect Coinme against Zero Hash stealing Coinme's business partners and technology.

8.     Coinme and Zero Hash executed a contract in which Zero Hash committed that "Zero Hash will not induce, influence, or encourage, any client, customer, supplier, business partner or other similar third party of [Coinme] … to alter, terminate, or breach its contractual or other business relationship with [Coinme]."

9.     Zero Hash also separately committed to not misappropriating or using any of Coinme's intellectual property designed to allow consumers to purchase cryptocurrency at Coinstar kiosks and committed to not encouraging or assisting anyone else in misappropriating that intellectual property.

10.    These contractual commitments extended past the termination date of Coinme's and Zero Hash's contracts.

11.    Coinme's and Zero Hash's business relationship continued for almost three years, and Coinme had no reason to suspect that Zero Hash would violate its contractual commitments.

12.     However, in August 2023, Coinme learned that Zero Hash had entered into a business relationship with MoneyGram, a Coinme partner, and stole Coinme's business with MoneyGram.

13.     Approximately a year later, Coinme learned that Zero Hash worked with Coinstar to replace Coinme's kiosk business with a new alternative platform enabled by Zero Hash.

14.     Apparently, Coinme had good reason to distrust Zero Hash.

15.     Zero Hash's threat was not only unexpected but existential; Coinme could lose a significant portion of its business due to Zero Hash's brazen conduct.

16.     Left with no alternatives to Zero Hash's breach of its contractual commitments to Coinme and tortious interferences with Coinme's business, Coinme brings this suit.

## PARTIES

17.     Plaintiff Coinme Inc. is a Virginia corporation headquartered in Seattle, WA.

18.     Defendant Zero Hash LLC is a limited liability company.  According to its website, Zero Hash LLC's sole member is Zero Hash Holdings Ltd., a Delaware corporation. Zero Hash LLC and Zero Hash Holdings Ltd. are headquartered at 327 N Aberdeen St, Chicago, Illinois 60607.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of this State and citizens or subjects of another State.

20.     This Court has personal jurisdiction over Zero Hash because:

    a.     Zero Hash is headquartered in Chicago, Illinois, and may be generally found in Illinois; and

      b.     Zero Hash agreed to submit to the personal jurisdiction of Illinois in the contract at issue here.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Zero Hash is a resident of this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the event or omissions giving rise to Coinme's claims occurred in this District.

## FACTS

### A.    Cryptocurrency and State Regulation

22.     According to the IRS (Rev. Rul. 2023-14):

> "Cryptocurrency is a type of digital currency that utilizes cryptography to secure transactions that are digitally recorded on a distributed ledger, such as a blockchain. Units of cryptocurrency are generally referred to as coins or tokens. Distributed ledger technology uses independent digital systems to record, share, and synchronize transactions, the details of which are recorded in multiple places at the same time with no central data store or administration functionality."

23.     Cryptocurrencies are generally not issued by any government.

24.     Currencies issued by governments are called "fiat currencies."

25.     Bitcoin is a cryptocurrency.

26.     Users access their cryptocurrencies using a "wallet," which contains a user's private passwords that grant them access to their cryptocurrency.

27.     Users buy and sell their cryptocurrencies using a cryptocurrency exchange.

28.     Specific cryptocurrency laws and regulations vary from state to state. *See, e.g.,* Jasperse, Joseph. "50-State Review of Cryptocurrency and Blockchain Regulation." Stevens Center for Innovation in Finance, June 23, 2022. https://stevenscenter.wharton.upenn.edu/publications-50-state-review/.

29.     Many states regulate cryptocurrency under existing money transmitter rules and do not allow entities to enable consumers to purchase or sell cryptocurrencies on their platforms without a license.

30.     Coinme possesses the requisite licenses in particular states that allow users to buy or sell cryptocurrency on its platform in those states.

**B.      Coinme's Business Relationship with Coinstar**

31.     Coinme sells technology and services, allowing customers to buy and sell cryptocurrencies, such as Bitcoin, on a third-party's platform.

32.     That third-party's platform may be digital (such as a smartphone application or website) or a physical location (such as a retail counter or kiosk).

33.     Coinstar is one such third party; it operates a network of automated self-service kiosks across the United States.

34.     Coinstar uses Coinme's technology to offer the ability to buy cryptocurrencies at its physical locations.

35.     Coinstar's kiosks are typically in supermarkets and other retail locations, allowing customers to convert loose change into cash or gift cards.

36.     Certain Coinstar kiosks also have bill acceptors installed, which are used for cryptocurrency transactions on Coinstar kiosks.

37.     In approximately October 2018, Coinme entered a business relationship with Coinstar.

38.     Under Coinme's relationship with Coinstar, Coinme's technology was integrated into Coinstar kiosks (the "Coinme Cash-to-Crypto Platform").

39.     Using Coinstar kiosks with the Coinme Cash-to-Crypto Platform, individual customers could use cash to purchase cryptocurrencies.

40.     The following is a screenshot of the Coinme Cash-to-Crypto Platform at a Coinstar kiosk in Fort Lauderdale, FL:



41.     Once acquired through the Coinme Cash-to-Crypto Platform, the customer's cryptocurrency would be placed in that customer's cryptocurrency wallet.

42.     Coinme designed, developed, and operated that wallet for the Coinme Cash-to-Crypto Platform.

**C.     Coinme's Business Relationship with MoneyGram**

43.     MoneyGram provides money transfer and bill payment services to customers that enable those customers to transfer funds to designated recipients.

44.     MoneyGram provides a smartphone application and a website for consumers to use its payment and money transfer services (the "MoneyGram Platform").

45.     MoneyGram customers can transfer funds to designated recipients using cash at physical retail agent locations like CVS Pharmacy.

46.     In approximately September 2020, Coinme entered a "Transaction Services Agreement" with MoneyGram.

47.     Coinme has its own smartphone application through which users can buy and sell cryptocurrencies, which are linked to their Coinme cryptocurrency wallet.

48.     The MoneyGram-Coinme Transaction Services Agreement allows Coinme's customers to buy and sell cryptocurrency by staging a cryptocurrency transaction in the Coinme smartphone application and completing that transaction with cash at a physical MoneyGram retail location.

49.     The following is a screenshot of Coinme's website describing the process by which consumers can use the Coinme app to purchase cryptocurrency with cash at a MoneyGram retail location:



50.     In December 2021, MoneyGram and Coinme entered into a First Amended and Restated Transaction Services Agreement.

51.     The First Amended and Restated Transactions Services Agreement (the "First Amended Agreement") expanded MoneyGram's and Coinme's business relationship.

52.     Under the First Amended Agreement, MoneyGram would use Coinme's cryptocurrency technology (the "Digital Asset Exchange Services") to allow MoneyGram users to buy and sell cryptocurrency directly in the MoneyGram Platform.

53.     Specifically, MoneyGram's Platform would use Coinme's application programming interfaces ("APIs") to provide cryptocurrency services in the MoneyGram application, including cryptocurrency buying and selling and maintenance of a cryptocurrency wallet.

54.     In the money transmission and cryptocurrency industries, companies always use written contracts to enter into the type of business relationship that MoneyGram and Coinme have.

55.     The money transmission industry is highly regulated.

56.     Coinme and MoneyGram, regulated entities, could not integrate Coinme's Digital Asset Exchange Services into the MoneyGram Platform without a contract.

57.     Since 2022, MoneyGram's market capitalization has been over a billion dollars.

58.     The First Amended Agreement is currently effective, but for any breaches, under its Term.

59.     The First Amended Agreement required MoneyGram to develop and integrate Coinme's Digital Asset Exchange Services into the MoneyGram Platform.

60.     Coinme also agreed to an exclusivity provision in the First Amended Agreement in exchange for providing Digital Asset Exchange Services to MoneyGram.

61.     Coinme agreed to that exclusivity provision in anticipation of its economic opportunity with MoneyGram.

62.     The First Amended Agreement imposed confidentiality restrictions on MoneyGram and Coinme.

63.     MoneyGram and Coinme agreed to share the revenue from transaction fees in the First Amended Agreement.

64.     Coinme spent significant resources to integrate Coinme's Digital Asset Exchange Services into the MoneyGram Platform.

65.     MoneyGram announced in a press release that Coinme's Digital Asset Exchange Services would be integrated into the MoneyGram Platform in November 2022.

**D.      Coinme's Business Relationship With Zero Hash**

66.     Zero Hash also sells technology and services (the "<u>Zero Hash Platform</u>"), allowing customers to buy and sell cryptocurrencies, such as Bitcoin, on a third-party's platform.

67.     Zero Hash describes their products as a "platform" that allows "custom crypto programs to reflect your unique customer needs." *See* https://zerohash.com/solutions/.

68.     Coinme and Zero Hash are typically competitors in the cryptocurrency industry.

69.     Zero Hash has the licenses required in the states where it operates to allow consumers to use its platform to buy and sell cryptocurrency.

70.     Beginning in March 2020, Coinme and Zero Hash entered into a series of contracts.

71.     These contracts between Coinme and Zero Hash were to allow the Coinme Cash-to-Crypto Platform to integrate with Coinstar kiosks located in states in which Zero Hash (but not Coinme) possessed the necessary state licenses to engage in cryptocurrency transactions.

72.     For example, Zero Hash had the necessary licenses to allow consumers to use its platform to buy and sell cryptocurrency in Alabama, but Coinme had not yet completed its licensure in that jurisdiction.

73.     The contracts between Coinme and Zero Hash included an Authorized Delegate Agreement and a Platform Operator Agreement. *See* Exs. A and B.

74.     The Authorized Delegate Agreement designated Coinme as Zero Hash's agent, which allowed Coinme to use Zero Hash's state licenses for the Coinme Cash-to-Crypto Platform integrated with Coinstar kiosks.

75.     The Platform Operator Agreement allowed Coinme to use Zero Hash's Platform as a "Platform Operator."

76.     The Platform Operator Agreement was necessary to allow Coinme to use Zero Hash's platform in states in which Coinme was Zero Hash's agent and where Zero Hash possessed the necessary state licenses to allow consumers to buy and sell cryptocurrency on Zero Hash's platform.

77.     The Authorized Delegate Agreement contained a confidentiality provision (*See* Ex. A § 9.1):

> General Confidentiality Obligations. Any and all non-public information in any form obtained by a Party ("Receiving Party") or its employees arising out of or related this Agreement and the Services, including but not limited to trade secrets, processes, computer software and other proprietary data, research, information, or documentation related thereto, shall be deemed to be confidential information ("Confidential Information"). Each Party agrees to hold such information in strict confidence and not to disclose such information to third parties (other than to its employees, its affiliates and their employees or its agents) or to use such information for any purpose whatsoever except as permitted by this Agreement or as expressly authorized in writing by the other Party ("Disclosing Party"). Each Party agrees to hold such information in strict confidence and comply by this Agreement and to advise each of its employees, affiliates, and agents who may be exposed to such Confidential Information of their obligations to keep such information confidential in accordance with this section.

78.     The Authorized Delegate Agreement stated that the confidentiality provision "shall survive the termination or expiration of this Agreement." (*Id.*)

79.     The Platform Operator Agreement includes an Illinois forum selection and choice of law clause (Ex. B at 14, No. 11):

The laws of the State of Illinois shall govern this Agreement without giving effect to the choice of law provisions thereof. Platform Operator and Zero Hash each agree to submit to the jurisdiction of the state or federal courts of Illinois and each of the Parties waives all rights to bring a motion for inconvenient forum or otherwise challenge the jurisdiction of such courts.

80. In February 2021, Coinme and Zero Hash amended the Platform Operator Agreement (the "Second Amendment to Zero Hash LLC Platform Operator Agreement" or the "Second Amendment"). *See* Ex. C.

81. The Second Amendment adds the following language to Section 6 (Zero Hash Representations) to the Platform Operator Agreement (*Id.*):

9. During the Initial Term or the Renewal Term, and for a period of one (1) year after the expiration or earlier termination of the Initial Term or the Renewal Term, Zero Hash will not induce, influence, or encourage, any client, customer, supplier, business partner or other similar third party of Platform Operator (each, a "Platform Operator Partner") to alter, terminate, or breach its contractual or other business relationship with Platform Operator.

82. The Second Amendment added the following language to Section 8.1 (Intellectual Property) to the Platform Operator Agreement (*Id.*):

Platform Operator has exclusive ownership of and rights to the software (the "Platform Operator Software") used by Platform Operator to provide individuals the ability to exchange fiat currency for bitcoin at physical kiosks and store bitcoin in a hosted digital currency wallet (the "Kiosk Service"), its use and content, as well as all related copyrights, trademarks, service marks, patent rights, and trade secrets and any other intellectual property rights therein (registered or unregistered) including any applications anywhere in the world.

Zero Hash will not:

a. Copy, modify, create derivative works from, reverse engineer, reverse assemble, or reverse compile any technology included in the Platform Operator Software or the Platform Operator Platform;

11

b. Remove, obscure, or alter any copyright, trademark, patent, or other notices or legends contained in any documentation or other materials produced, distributed, or published by Platform Operator;

c. Distribute, rent, sell, lease, redistribute, release, or license the Platform Operator Software or the Platform Operator Platform, or any part thereof, to any third party or otherwise allow access by a third party, other than its authorized employees;

d. Take or authorize any action that could detrimentally interfere with the performance of the Platform Operator Software or Platform Operator Platform, use any robot, spider, or other device or process to monitor or copy the Platform Operator Software or Platform Operator Platform, or knowingly transmit any virus or other potentially harmful device in connection with its use of the Platform Operator Software or Platform Operator Platform; or

e. Assist or encourage any third party to engage in any activity prohibited under Subsections 8.1.a through 8.1.d of this Agreement.

83. Coinme is the "Platform Operator" in the Second Amendment.

84. Coinstar is a "Platform Operator Partner" as defined in the Second Amendment.

85. MoneyGram is a "Platform Operator Partner" as defined in the Second Amendment.

86. The Coinme Cash-to-Crypto Platform, as integrated into Coinstar kiosks, is "Platform Operator Software" as defined in the Second Amendment.

87. Relying on the contractual rights in the Authorized Delegate Agreement and the Platform Operator Agreement, as amended in the Second Amendment, and in light of Zero Hash's assurances, Coinme furnished certain confidential and proprietary information to Zero Hash.

88. Zero Hash learned of Coinme's contracts with Coinstar.

89. The information Coinme furnished included information regarding the technical aspects of the Coinme-Coinstar business relationship and the Coinme Cash-to-Crypto Platform.

90.     Coinme also provided Zero Hash with business information detailing the economic advantages of the Coinme-Coinstar relationship.

91.     Zero Hash did not have a business relationship with Coinstar before March 2020.

92.     Zero Hash did not have a business relationship with MoneyGram before March 2020.

**E.     Zero Hash's Breach of Its Contractual Commitments to Steal Coinme's Business with Coinstar**

93.     Despite its contractual obligations to Coinme, Zero Hash collaborated with Coinstar to displace the Coinme Cash-to-Crypto Platform at Coinstar's kiosks.

94.     This alternative cryptocurrency purchasing platform is called "CINQ."

95.     CINQ, like the Coinme Cash-to-Crypto Platform, allows customers to use cash to purchase cryptocurrency.

96.     On information and belief, Zero Hash developed CINQ in conjunction with Coinstar.

97.     On information and belief, Zero Hash had agreed to a business relationship with Coinstar by, at the latest, March 2023.

98.     CINQ uses Zero Hash's cryptocurrency transaction services to allow customers to purchase cryptocurrencies.

99.     Zero Hash leveraged confidential information provided under the contractual protections of the Authorized Delegate Agreement and Platform Operator Agreement to develop CINQ.

100.     CINQ was released onto Coinstar kiosks by, at the latest, August 2024.

101.    CINQ identified Zero Hash as its "cryptocurrency services provide[r]":[1]



102.    There are many similarities between the Coinme Cash-to-Crypto Platform and CINQ.

103.    The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



---

[1] The following screenshots are from the same Coinstar kiosk in Fort Lauderdale.

104.     The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



105.     The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



106.     The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



107.    The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



108.    The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



109.    The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



110.    The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



111.     The following is a side-by-side comparison of screenshots showing the Coinme Cash-to-Crypto Platform and CINQ both operating on the same Coinstar kiosk:



112.     Such similarities between Coinme's Cash-to-Crypto Platform and CINQ are not coincidental.

113.     To the extent that the Coinme Cash-to-Crypto Platform coexists on Coinstar kiosks with CINQ, CINQ obscures the Coinme Cash-to-Crypto Platform by relegating it to a tiny box on the bottom of the kiosk screen:



114. As noted above, see ¶ 77, the Authorized Delegate Agreement forbids Zero Hash from using Coinme's confidential information for any purpose whatsoever except as permitted by the Authorized Delegate Agreement or as expressly authorized in writing by the other Coinme.

115. As noted above, see ¶ 82, the Second Amendment forbids Zero Hash from copying, modifying, creating derivative works from, reverse engineering, reverse assembling, or reverse compiling any technology included in the Coinme Cash-to-Crypto Platform.

116. As noted above, see ¶ 82, the Second Amendment forbids Zero Hash from assisting or encouraging any third party in copying, modifying, creating derivative works from, reverse engineering, reverse assembling, or reverse compiling any technology included in the Coinme Cash-to-Crypto Platform.

19

117.    Coinstar and Zero Hash could not duplicate Coinme's Cash-to-Crypto Platform functionality to such a high degree without improperly reusing Coinme's non-public, confidential APIs and other proprietary information.

118.    Coinme worked intensely for six years to develop the Coinme Cash-to-Crypto Platform.

119.    Coinme invested tens of millions of dollars to develop the Coinme Cash-to-Crypto Platform.

120.    Zero Hash and Coinstar jointly brought CINQ to market in a tiny fraction of the six years it required Coinme to develop its Cash-to-Crypto Platform to its current state.

121.    Zero Hash and Coinstar were able to rapidly bring CINQ to market by improperly using Coinme's non-public, confidential APIs and other proprietary information.

122.    Coinstar could not have created CINQ without Zero Hash.

123.    As noted above, *see* ¶ 81, the Second Amendment required Zero Hash, *inter alia*, not to induce, influence, or encourage, any client, customer, supplier, business partner or other similar third party of Coinme, such as Coinstar, to alter, terminate, or breach its contractual or other business relationship with Coinme.

124.    Coinstar altered, terminated, and/or breached its contracts with Coinme in developing the CINQ platform, developed by Zero Hash, by:

a.      Using Coinme's confidential and trade secret information to develop CINQ; and

b.      Failing to market the Coinme Cash-to-Crypto Platform by replacing the Coinme Cash-to-Crypto Platform at Coinstar kiosks with CINQ.

125.    Coinstar altered, terminated, and/or breached its business relationship with Coinme in developing the CINQ platform, developed by Zero Hash, by:

        a.    Acting in bad faith concerning its business relationship with Coinme by replacing the Coinme Cash-to-Crypto Platform with CINQ, developed by Zero Hash;

        b.    Actively concealing from Coinme its work with Zero Hash to develop CINQ; and

        c.    Copying the Coinme Cash-to-Crypto Platform user interface design in CINQ.

126.    The availability of CINQ on Coinme kiosks has confused Coinme's customers.

127.    When customers purchase cryptocurrency through CINQ, their currency goes into a different cryptocurrency wallet from the Coinme cryptocurrency wallet.

128.    Zero Hash operates the CINQ wallets created for CINQ customers.

129.    Customers intending to purchase cryptocurrency for their Coinme wallets have inadvertently purchased currency that was then deposited into a wallet created by CINQ.

130.    Coinme has received complaints from customers who have blamed Coinme for transactions that resulted in customer deposits into CINQ wallets instead of into those customers' Coinme cryptocurrency wallets.

131.    This customer confusion severely harms Coinme's business.

132.    Coinme's weekly sales volume of cryptocurrencies on Coinstar kiosks has fallen substantially.

133.    The following chart shows the impact of CINQ's release in mid-August 2024 on Coinme's sales volume at Coinstar kiosks:



134. Coinme's reduction in sales volume from Coinstar kiosks is a result of CINQ's availability and prominence on those kiosks.

**F.    Zero Hash's Interference with Coinme's Business with MoneyGram**

135. Despite Zero Hash's commitments to Coinme in the Second Amendment, Zero Hash has undercut Coinme in its relationship with partners other than Coinstar.

136. Coinme's Digital Asset Exchange Services were integrated into the MoneyGram Platform by November 2022; customers using the MoneyGram Platform to buy cryptocurrency would see Coinme's information and branding.

137. Zero Hash had knowledge of Coinme's relationship with MoneyGram by, at the latest, the public announcement in November 2022.

138. On information and belief, because of Zero Hash's experience in the industry, MoneyGram's press release, the appearance of Coinme's information and branding on the consumer facing MoneyGram app and website, and knowledge of Coinme's contracts with Coinstar, Zero Hash knew that MoneyGram had a contract with Coinme for MoneyGram to integrate Coinme's Digital Asset Exchange Services into the MoneyGram Platform.

139. At some point between November 2022 and August 2023, Zero Hash entered into a relationship with MoneyGram to provide for MoneyGram to use the Zero Hash Platform to

allow MoneyGram users to buy and sell cryptocurrency directly within the MoneyGram Platform.

140.    In August 2023, at MoneyGram's direction, Coinme was working on adding additional functionality to Coinme's Digital Asset Exchange Services for MoneyGram's Platform.

141.    In August 2023, knowing that Coinme was adding functionality for the MoneyGram Platform, MoneyGram informed Coinme that it had entered into a business arrangement with Zero Hash to replace Coinme's Digital Asset Exchange Services in MoneyGram's Platform with the Zero Hash Platform.

142.    MoneyGram and Zero Hash replaced Coinme's Digital Asset Exchange Services in MoneyGram's Platform with the Zero Hash Platform.

143.    If a new user buys, sells, or transfers cryptocurrency on the MoneyGram Platform, that transaction will use the Zero Hash Platform and not Coinme's Digital Asset Exchange Services.

144.    If a user who previously purchased cryptocurrency on the MoneyGram Platform with Coinme's Digital Asset Exchange Services looks at their account today, they would see the cryptocurrency tied to their Coinme account, but not their Coinme transaction history.

145.    As noted above, *see* ¶ 81, the Second Amendment required Zero Hash, *inter alia*, not to induce, influence, or encourage, any client, customer, supplier, business partner or other similar third party of Coinme, such as MoneyGram, to alter, terminate, or breach its contractual or other business relationship with Coinme.

146.    MoneyGram altered, terminated, and/or breached its contracts with Coinme by entering into a business relationship with Zero Hash by, at least:

    a.      Failing to integrate the Coinme Digital Asset Exchange Services into the MoneyGram Platform and instead using the Zero Hash Platform; and

    b.      Failing to fully make the Coinme Digital Asset Exchange Services available to MoneyGram customers.

147. MoneyGram altered, terminated, and/or breached its business relationship with Coinme by entering into a business relationship with Zero Hash and by:

    a.      Acting in bad faith concerning its business relationship with Coinme by replacing the Coinme Digital Asset Exchange Services in the MoneyGram Platform with the Zero Hash Platform; and

    b.      Actively concealing from Coinme, prior to August 2023, MoneyGram's work with Zero Hash to replace the Coinme Digital Asset Exchange Services in the MoneyGram Platform with the Zero Hash Platform.

148. The Zero Hash and MoneyGram relationship displaced the Coinme and MoneyGram agreement for MoneyGram to use Coinme's technology in the MoneyGram app.

149. Zero Hash's actions with MoneyGram have further harmed Coinme's business.

### COUNT I
### BREACH OF CONTRACT AGAINST ZERO HASH
### FOR BREACH OF AUTHORIZED DELEGATE AGREEMENT

150. Coinme realleges and incorporates each of the allegations set forth in paragraphs 1–149 as if restated herein in their entirety.

151. Coinme and Zero Hash are parties to the Authorized Delegate Agreement. *See* Ex. A.

152. Coinme has fully complied with the terms of the Authorized Delegate Agreement.

153.    Zero Hash has breached at least § 9, the Confidentiality provision of the Authorized Delegate Agreement, by misappropriating confidential information belonging to Coinme to develop CINQ.

154.    That confidential information includes the technical aspects and economics of the Coinme-Coinstar business relationship and the Coinme Cash-to-Crypto Platform.

155.    Zero Hash stole Coinme's business with Coinstar by misappropriating confidential information belonging to Coinme to steal Coinme's business with Coinstar.

156.    The confidentiality restrictions contained in the Authorized Delegate Agreement survive the expiration or termination of the agreement and remain valid and enforceable.

157.    Zero Hash's breaches have damaged and continue to damage Coinme and its business.

### COUNT II
### BREACH OF CONTRACT AGAINST ZERO HASH
### FOR BREACH OF PLATFORM OPERATOR AGREEMENT
### WITH REGARD TO COINSTAR

158.    Coinme realleges and incorporates each of the allegations set forth in paragraphs 1–157 as if restated herein in their entirety.

159.    Coinme and Zero Hash are parties to the Platform Operator Agreement. *See* Ex. B.

160.    Coinme and Zero Hash are parties to the Second Amendment to the Platform Operator Agreement.

161.    Coinme has fully complied with the terms of the Platform Operator Agreement.

162.    Zero Hash has breached at least §§ 6 and 8 of the Platform Operator Agreement, as amended by Coinme and Zero Hash in February 2021 in the Second Amendment.

163.     Zero Hash worked with Coinstar to develop CINQ, which Coinstar used to displace the Coinme Cash-to-Crypto Platform on thousands of Coinstar kiosks.

164.     Zero Hash breached § 6 of the Platform Operator Agreement, as Amended by the Second Amendment to the Platform Operator Agreement, by inducing, influencing, and encouraging Coinstar to alter, terminate, or breach its contractual and business relationships with Coinme.

165.     CINQ, developed by Zero Hash and Coinstar, is a derivative work of the Coinme Cash-to-Crypto Platform, as shown by its duplicative functionality and near-identical user interface.

166.     To the extent CINQ does not totally displace the Coinme Cash-to-Crypto Platform on Coinstar kiosks, it obscures the Coinme Cash-to-Crypto Platform.

167.     CINQ detrimentally interferes with the  Coinme Cash-to-Crypto Platform.

168.     Zero Hash breached § 8 of the Platform Operator Agreement, as Amended by the Second Amendment to the Platform Operator Agreement, by developing, providing technology for, or otherwise assisting Coinstar in developing the CINQ platform.

169.     Sections 6 and 8 of the Platform Operator Agreement were intended to prevent Zero Hash from stealing Coinme's business with Coinstar by developing a replacement cryptocurrency trading platform for the Coinme Cash-to-Crypto Platform on Coinstar kiosks.

170.     Zero Hash breached these provisions by stealing Coinme's business with Coinstar and by developing a replacement cryptocurrency trading platform for the Coinme Cash-to-Crypto Platform on Coinstar kiosks.

171.     Zero Hash's breaches have damaged and continue to damage Coinme and its business.

**COUNT III**
**BREACH OF CONTRACT AGAINST ZERO HASH**
**FOR BREACH OF PLATFORM OPERATOR AGREEMENT**
**WITH REGARD TO MONEYGRAM**

172.    Coinme realleges and incorporates each of the allegations set forth in paragraphs 1–171 as if restated herein in their entirety.

173.    Coinme and Zero Hash are parties to the Platform Operator Agreement. *See* Ex. B.

174.    Coinme and Zero Hash are parties to the Second Amendment to the Platform Operator Agreement.

175.    Coinme has fully complied with the terms of the Platform Operator Agreement.

176.    Zero Hash has breached at least § 6 of the Platform Operator Agreement, as amended by Coinme and Zero Hash in February 2021 in the Second Amendment.

177.    Zero Hash and MoneyGram entered into an agreement between November 2022 and August 2023 to displace Coinme's Digital Asset Exchange Services with the Zero Hash Platform on the MoneyGram Platform.

178.    Zero Hash breached § 6 of the Platform Operator Agreement, as Amended by the Second Amendment to the Platform Operator Agreement, by inducing, influencing, and encouraging MoneyGram to alter, terminate, or breach its contractual and business relationships with Coinme.

179.    Section 6 of the Platform Operator Agreement was intended to prevent Zero Hash from stealing Coinme's business with MoneyGram.

180.    Zero Hash induced, influenced, or encouraged MoneyGram to alter, terminate, or breach its contractual and business relationships with Coinme by replacing Coinme's Digital Asset Exchange Services with the Zero Hash Platform on the MoneyGram Platform

181.    Zero Hash's breaches have damaged and continue to damage Coinme and its business.

## COUNT IV
**TORTIOUS INTERFERENCE WITH CONTRACT UNDER ILLINOIS LAW AGAINST ZERO HASH FOR INDUCING MONEYGRAM TO BREACH ITS CONTRACTS WITH COINME**

182.    Coinme realleges and incorporates each of the allegations set forth in paragraphs 1- 181 as if restated herein in their entirety.

183.    Coinme and MoneyGram entered into certain contracts, which are (but for MoneyGram's material breaches) fully valid and enforceable.

184.    On information and belief, because on Zero Hash's experience in the industry, MoneyGram's press release, the appearance of Coinme's information and branding on the consumer facing MoneyGram app and website, and knowledge of Coinme's contracts with Coinstar, Zero Hash knew that MoneyGram had a contract with Coinme for MoneyGram to integrate Coinme's Digital Asset Exchange Services into the MoneyGram platform.

185.    Zero Hash intentionally and unjustifiably interfered with these contracts entering into an agreement with MoneyGram to use the Zero Hash Platform in the MoneyGram Platform, which displaced the Coinme Digital Asset Exchange Services from the MoneyGram Platform.

186.    MoneyGram altered, terminated, and/or breached its contracts with Coinme by entering into a business relationship with Zero Hash by, at least:

a.    Failing to integrate the Coinme Digital Asset Exchange Services into the MoneyGram Platform by instead using the Zero Hash Platform; and

b.    Failing to fully make the Coinme Digital Asset Exchange Services available to MoneyGram customers.

187.     MoneyGram's breach would not have occurred but for Zero Hash entering into a business relationship with MoneyGram to provide the Zero Hash Platform to MoneyGram.

188.     Zero Hash's actions are tortious and unlawful under Illinois law.

189.     Zero Hash's interference with Coinme's contracts with MoneyGram has damaged and continues to damage Coinme and its business.

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**UNDER ILLINOIS LAW AGAINST ZERO HASH FOR INTERFERING WITH**
**COINME'S BUSINESS RELATIONSHIP WITH MONEYGRAM**

190.     Coinme realleges and incorporates each of the allegations set forth in paragraphs 1- 189 as if restated herein in their entirety.

191.     Between December 2021 and August 2023, Coinme expected to enter business relationships with MoneyGram, as demonstrated by its work to integrate Coinme's Digital Asset Exchange Services into the MoneyGram Platform and its work to modify Coinme's Digital Asset Exchange Services to increase its functionality for the MoneyGram Platform.

192.     Coinme anticipated fees from providing Coinme's Digital Asset Exchange Services to the MoneyGram Platform.

193.     Coinme agreed not to provide Digital Asset Exchange Services to MoneyGram's competitors in exchange for an economic advantage with MoneyGram.

194.     Zero Hash knew of this business relationship between Coinme and MoneyGram.

195.     Zero Hash intentionally and improperly interfered with Coinme's prospective economic relationship with MoneyGram.

196.     MoneyGram terminated its prospective business relationship with Coinme by replacing Coinme's Digital Asset Exchange Services with the Zero Hash Platform on the MoneyGram Platform.

197.    Zero Hash's interference was unjustified because the Second Amendment to the Platform Operator Agreement between Zero Hash and Coinme forbid Zero Hash from inducing, influencing, and encouraging MoneyGram to alter, terminate, or breach its contractual and business relationships with Coinme.

198.    On information and belief, Zero Hash misrepresented Coinme's financial health to MoneyGram to interfere with Coinme's business relationship with MoneyGram.

199.    Zero Hash's interference was unjustified because MoneyGram had committed to using Coinme's Digital Asset Exchange Services.

200.    Zero Hash's interference was unjustified because, on information and belief, Zero Hash declined to inform MoneyGram that Zero Hash had a contractual commitment with Coinme forbidding Zero Hash from inducing, influencing, and encouraging MoneyGram to alter, terminate, or breach its contractual and business relationships with Coinme

201.    Zero Hash's interference was unjustified because it caused confusion to customers who previously purchased cryptocurrency using Coinme's Digital Asset Exchange Services on the MoneyGram Platform and lost access to their transaction history.

202.    MoneyGram's action would not have occurred but for Zero Hash's actions to provide the Zero Hash Platform to MoneyGram to replace Coinme's Digital Asset Exchange Services on the MoneyGram Platform.

203.    Zero Hash's actions are tortious and unlawful under Illinois law.

204.    Zero Hash's interference with Coinme's economic advantage with MoneyGram has damaged and continues to damage Coinme and its business.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Coinme Inc. requests this Court enter judgment in favor of Coinme and against Defendant Zero Hash LLC and grant Coinme the following relief:

1.     Judgment against Defendant Zero Hash LLC and an award of all damages and exemplary relief allowed by law, in an amount to be proven at trial, and including without limitation:

        a.     Damages incurred by Coinme as a result of Zero Hash's misconduct;

        b.     Disgorgement of all other unjust enrichment to Zero Hash, including revenues attributable to CINQ and MoneyGram; and

2.     For temporary and permanent injunctive relief preventing Zero Hash from supporting CINQ, using Coinme's confidential, proprietary, and trade secret information, supporting the MoneyGram Platform, and any other further misconduct.

3.     For attorney's fees and costs under any applicable provision of law or applicable agreement.

4.     For pre- and post-judgment interest as allowed by law.

5.     For any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff Coinme hereby demands trial by jury of all issues in this action so triable.

Dated: October 24, 2024

Respectfully submitted,

*/s/ Suyash Agrawal*

Suyash Agrawal
Constance Grieves
Christopher M. Walling
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
(312) 283-1590
sagrawal@masseygail.com
cgrieves@masseygail.com
cwalling@masseygail.com

*Counsel for Plaintiff Coinme, Inc..*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system this October 24, 2024.

*/s/ Christopher M. Walling*
Christopher M. Walling