# Exhibit A
# Authorized Delegate Agreement

# AUTHORIZED DELEGATE AGREEMENT

This Authorized Delegate Agreement is made as of March 16, 2020 ("**Effective Date**") between Zero Hash LLC, a Delaware limited liability company ("**Licensee**"), and Coinme Inc., a Delaware corporation ("**Agent**") (each a "**Party**," and collectively, the "**Parties**"). This Authorized Delegate Agreement and all appendices, as may be amended from time to time, are referred to herein as the "**Agreement**."

## RECITALS

A. Licensee is engaged in the business of money transmission, and is licensed or otherwise authorized to provide money transmission services in certain jurisdictions;

B. Licensee desires to appoint Agent, as its representative and designated agent ("**Authorized Delegate**") with the authority to provide the Services (defined below) on Licensee's behalf in conformance with Applicable Law (defined below) and this Agreement; and

C. Agent is willing to perform such Services on the terms and conditions set forth herein.

Therefore, the Parties agree as follows:

**1. Appointment as Agent.**

1.1 *Appointment*. Licensee hereby appoints Agent as its Authorized Delegate, with the authority to provide the Services, pursuant to the terms and conditions set forth in this Agreement. "**Services**" shall mean the services described in Appendix A to this Agreement, which may be amended and supplemented from time to time by agreement of the Parties.

1.2 *Geographic Scope of Appointment*. Licensee only appoints Agent as its representative and Authorized Delegate in those jurisdictions identified in Appendix B to this agreement, as amended by agreement of the Parties from time to time.

1.3 *Authorized Delegate Locations.* Agent may offer the Services at any of the locations identified on Appendix C, as amended by agreement of the Parties from time to time.

1.4 *No Sub-Delegates*. Agent shall not delegate its appointment hereunder without the prior written consent of Licensee and any Regulator whose consent is required by Applicable Law. "**Regulator**" means a governmental authority in a U.S. state, territory that issues licenses pursuant to the money transmitter, sale of checks, or similar statute of that state, district, or territory.

1.5 *Requests to Add Jurisdictions or Locations*. Agent may request that Licensee appoint Agent as an authorized delegate in additional jurisdictions or locations by submitting a written request to Licensee by completing the form attached as Appendix D for each new jurisdiction and location. Licensee will endeavor, using best commercial efforts, to appoint Agent as an authorized delegate in each requested jurisdiction and location, however such status may be subject to regulatory approval. As such, Licensee does not guarantee that all jurisdictions and locations will be approved or authorized as Authorized Delegate locations.

147302268.1

**1.6** *Requests to Remove Jurisdictions or Locations*. Agent may request that Licensee remove Agent as an authorized delegate in certain jurisdictions or locations by submitting a written request to Licensee. Licensee will endeavor, using best commercial efforts, to remove Agent as an authorized delegate in each requested jurisdiction and location.

**1.7** *Notification Requirements*.

**1.7.1** Licensee shall execute all documents, make all filings or registrations and take all other actions necessary to appoint Agent as an Authorized Delegate in accordance with applicable money transmitter, sale of checks, or similar statutes in the jurisdictions identified in Appendix B.

**1.7.2** Licensee shall provide the Regulator with written notice of its appointment of Agent as an Authorized Delegate in each jurisdiction. The written notice shall include a copy of this Agreement. In jurisdictions where express consent from a Regulator is required, the Parties shall not begin providing the Services until the Regulator has consented to Licensee's appointment of Agent as an Authorized Delegate.

**2. Compliance.**

**2.1** *Applicable Law*. The Parties shall comply with Applicable Law in their provision of the Services including, without limitation, those provisions set forth in Appendix E attached hereto and incorporated herein. Appendix E may be amended and supplemented by agreement of the Parties from time to time. "**Applicable Law**" means any and all foreign, federal, state and local laws, treaties, rules, and regulations, including, without limitation, the Bank Secrecy Act and the regulations promulgated thereunder, including, without limitation, 31 C.F.R. § 1022.210, 31 C.F.R. § 1022.320, and any successor provisions, any and all sanctions or regulations enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, and statutes or regulations relating to money transmission, that are applicable to the provision of the Services, or otherwise applicable to either of the Parties. Licensee shall notify Agent of states, territories, or districts that it is licensed or authorized to operate in or are otherwise applicable to the provision of the Services.

**2.2** *Supervision*. Agent acknowledges and agrees that the Services, and the activities of Licensee and Agent under this Agreement, are subject to the supervision, examination, and regulation of various Regulators having jurisdiction over Licensee as a licensed money transmitter.

**2.3** *Compliance Audits*. Agent acknowledges and agrees that Licensee or certain Regulators may periodically conduct audits of Agent, including a review of its facilities, books, and records related to this Agreement or the Services, or to confirm Agent's compliance with Applicable Law and this Agreement. Costs associated with audits initiated by a Regulator shall be borne by Agent, unless otherwise agreed to by Licensee.

**2.4** *Recordkeeping*. Agent shall retain records relating to any transaction involving the Services as otherwise required under 31 C.F.R. § 1010.410 and other recordkeeping provisions of Applicable Law.

 **2.5** *Reporting*. Agent shall, in a timely manner, provide all information requested by Licensee in connection with periodic reporting requirements required under Applicable Law or as otherwise reasonably requested by Licensee. Except as otherwise agreed upon by the Parties, Licensee shall be responsible for submitting all periodic reports to Regulators.

**3.** **Liability; Warranties.**

 **3.1** *Limitations of Liability*. NEITHER PARTY, NOR THEIR RESPECTIVE PARENTS OR AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY, WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING LOST PROFITS (EVEN IF SUCH DAMAGES ARE FORESEEABLE, AND WHETHER OR NOT ANY PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM OR RELATING TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE WRONGFUL DEATH OR INJURY OF ANY PERSON. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS CONTAINED IN THIS SUBSECTION 3.1 SHALL NOT APPLY TO ANY CLAIM THAT IS SUBJECT TO INDEMNIFICATION UNDER SECTION 4.

 **3.2** *Disclaimer of Warranties*. NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, AND HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

 **3.3** *Duty to Mitigate Damages*. Each Party shall have the duty to mitigate damages for which the other Party may become responsible.

**4.** **Indemnification.**

 **4.1** *Indemnification by Licensee*. Licensee covenants and agrees to indemnify and hold Agent, its parent or affiliates, and their respective officers, directors, employees, agents, and permitted assigns harmless against any and all liability, damages, costs, expenses (including reasonable legal fees and expenses), for any third party claim or demand, including, without limitation, any fees or penalties assessed by any federal, state, or local regulatory authority ("**Claim**") that arises out of or is related to: (a) Licensee's breach of a representation, warranty, or obligation under this Agreement; or (b) any negligence, fraud, or willful misconduct by Licensee or any of its employees, agents or its representatives. This provision shall not apply with respect to Agent to the extent Agent is obligated to provide indemnity under subsection 4.2 below.

 **4.2** *Indemnification by Agent*. Agent covenants and agrees to indemnify and hold Licensee, its respective parent or affiliates, and respective officers, directors, employees, agents, and permitted assigns harmless against any Claim that arises out of or is related to: (a) Agent's breach of a representation, warranty, or obligation under this Agreement; or (b) any negligence, fraud, or willful misconduct by Agent or any of its employees, agents or representatives. This provision shall not apply with respect to Licensee to the extent Licensee is obligated to provide indemnity under subsection 4.1 above.

147302268.1

 **4.3** *Indemnification Procedure*. If any Claim is asserted against any Party and/or its parent or affiliates, or their respective officers, directors, employees, agents (individually or collectively, the "**Indemnified Party**") by any person who is not a Party to this Agreement in respect of which the Indemnified Party may be entitled to indemnification under the provisions of subsections 4.1 or 4.2 above, written notice of such Claim shall promptly be given to any Party or Parties (individually or collectively, the "**Indemnifying Party**") from whom indemnification may be sought. The Indemnifying Party shall have the right, by notifying the Indemnified Party within 10 business days of its receipt of the notice of the Claim, to assume the entire control (subject to the right of the Indemnified Party to participate at the Indemnified Party's expense and with counsel of the Indemnified Party's choice) of the defense, compromise, or settlement of the matter, including, at the Indemnifying Party's expense, employment of counsel of the Indemnifying Party's choice. The Indemnifying Party shall not compromise or settle a Claim against the Indemnified Party without the Indemnified Party's consent, which shall not be unreasonably withheld or delayed, where such compromise or settlement involves the payment of money or an admission of liability by the Indemnified Party.

**5.** **Remittance of Funds.** All money received from customers in connection with the provision of the Services (the "**Funds**") shall be remitted in accordance with the requirements in Appendix A.

**6.** **Fees/Commissions; Costs and Expenses.**

 **6.1** *Fees/Commissions*. Licensee shall pay Agent a commission as set forth in Schedule A for each transaction by Agent at an Authorized Delegate location.

 **6.2** *Costs and Expenses*. Agent shall reimburse to Licensee any costs and expenses that are (i) incurred due to coverage requirements required by each jurisdiction identified in Appendix B and (ii) in excess of Licensee's obligations without Agent as its delegate. These additional costs and expenses shall be agreed upon in writing prior to being incurred, assessed on a pass-through basis by Licensee, and paid within 30 days of becoming incurred by Licensee.

**7.** **Representations and Warranties.**

 **7.1** *Licensee's Representations*. Licensee represents and warrants:

  **7.1.1** it is duly organized, validly existing, and in good standing in the jurisdictions where it was organized and operates and has full power and authority to enter in and perform this Agreement;

  **7.1.2** the execution and delivery of this Agreement by the individual executing it has been duly authorized;

  **7.1.3** it maintains the money transmitter, sale of checks, or similar licensees necessary to offer the Services in each of the jurisdictions identified in Appendix B and that it shall maintain such licenses throughout the duration of this Agreement.

 **7.2** *Agent's Representations*. Agent represents and warrants:

147302268.1

      **7.2.1** it is duly organized, validly existing, and in good standing in the jurisdictions where it was organized and operates and has full power and authority to enter in and perform this Agreement; and

      **7.2.2** the execution and delivery of this Agreement by the individual executing it has been duly authorized.

**8. Term.**

  **8.1** *Term*. This Agreement shall commence on the Effective Date and shall continue in effect for three year from the Effective Date (the "**Initial Term**"). After the Initial Term, this Agreement shall continue in effect, but either Party may terminate it any time without cause by giving at least 60 days' written notice to the other Party.

  **8.2** *Termination*. This Agreement may be terminated for cause immediately:

      **8.2.1** By a Party in the event that:

          **(a)** The other Party materially breaches this Agreement and such breach remains uncured for 10 days after receiving written notice from the non-breaching Party;

          **(b)** The other Party is the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors; or

          **(c)** The other Party is the subject of a proceeding for the appointment of a receiver, trustee, or similar officer.

  **8.3** By Agent in the event that a federal, state, or local governmental authority

      **8.3.1** prohibits Licensee from operating, temporarily or permanently, from operating in a jurisdiction in which Licensee has appointed Agent as its Authorized Delegate.

  **8.4** *Procedure Upon Termination.* Upon termination of this Agreement: Agent's right to access and/or use Licensee's Platform as described herein shall cease;

147302268.1

    **8.4.1**    The Parties shall cease use of any Confidential Information (defined below);

    **8.4.2**    The Parties shall, within 10 business days following the termination of this agreement, remit to the other Party all monies due and owing under this Agreement;

    **8.4.3**    Within a reasonable time period after the termination of this Agreement, the Parties shall return all Confidential Information to the Disclosing Party (defined below) or destroy such Confidential Information and provide a certification of destruction in writing to the Disclosing Party; and

    **8.4.4**    To the extent necessary, the Parties shall cooperate in order to transfer some or all digital currency held on behalf of customers of the Service in an orderly fashion.

**9.**     **Confidentiality**

    **9.1**    *General Confidentiality Obligations.* Any and all non-public information in any form obtained by a Party ("**Receiving Party**") or its employees arising out of or related this Agreement and the Services, including but not limited to trade secrets, processes, computer software and other proprietary data, research, information, or documentation related thereto, shall be deemed to be confidential information ("**Confidential Information**"). Each Party agrees to hold such information in strict confidence and not to disclose such information to third parties (other than to its employees, its affiliates and their employees or its agents) or to use such information for any purpose whatsoever except as permitted by this Agreement or as expressly authorized in writing by the other Party ("**Disclosing Party**"). Each Party agrees to hold such information in strict confidence and comply by this Agreement and to advise each of its employees, affiliates, and agents who may be exposed to such Confidential Information of their obligations to keep such information confidential in accordance with this section.

          Confidential Information does not include information disclosed by the Disclosing Party that the Receiving Party can prove by competent and admissible evidence: (i) is or has become generally publicly known through no fault of the Receiving Party, (ii) was in its possession or known by it, without restriction, prior to receipt from the Disclosing Party, (iii) was rightfully disclosed to it by a third party without restriction under Applicable Law, or (iv) was independently developed without use of or access to any Confidential Information of the Disclosing Party.

    **9.2**    *Exceptions.* The Parties and their respective counsel may disclose the Confidential Information (a) to persons for whom such information is necessary to effectuate the provisions of the Agreement (and who shall be advised of its confidentiality and agree to be bound by this provision), (b) to those employees and outside professional advisors (e.g., accountants, legal counsel, tax advisors) who need to be aware of this Agreement or its terms in the ordinary course of business to perform their duties and to properly advise the Parties, (c) to the extent such disclosure is required for enforcement of this Agreement; or **(a)** as otherwise required by U.S. federal or state law, or foreign law, including for example compliance with legally authorized discovery procedures or the notice requirements of the securities laws of the United States.

147302268.1

Notwithstanding any contrary provision in this Agreement, the Parties are permitted to disclose Confidential Information in response to a valid subpoena or other valid legal process so long as the procedures in this Paragraph are followed. If a Party has received a valid subpoena or other valid legal process seeking production of Confidential Information, it must provide the other Party with written notice of such subpoena or other legal process, via electronic mail/PDF, or hand delivery, at least 15 business days before disclosure or a lesser period if ordered by the court, in order to afford that Party an opportunity to object. The Party in receipt of the valid subpoena or other valid legal process shall not produce the Confidential Information during this initial period. If, within the initial period, a Party gives notice to the other Party that it opposes production (the "**Objecting Party**"), the Party in receipt of the valid subpoena or other valid legal process shall not thereafter produce such information except pursuant to a court order requiring production or rejecting the Party's objections. If a court orders production of the Confidential Information, then production of such documents pursuant to that court order shall not be deemed a violation of this Agreement. The Parties are responsible for asserting any objection to the requested production, but the Objecting Party shall be responsible for seeking a protective order or other judicial relief. Nothing herein shall be construed as requiring the Parties to subject themselves to any penalties for non-compliance with any subpoena, access request, or legal process, or to seek any relief from the court.

10. **Intellectual Property.**

    10.1 *Restrictions on Use of Licensee's Intellectual Property*. Licensee has developed a proprietary platform that offers, among other things, hosted digital currency wallets and settlement services (the "**Platform**"). Licensee has exclusive ownership of and rights to the Platform, its use, and content, as well as all related copyrights, trademarks, service marks, patent rights, and trade secrets and any other intellectual property rights therein (registered or unregistered). Agent shall not:

    10.1.1 Copy, modify, create derivative works from, reverse engineer, reverse assemble, or reverse compile any technology in the Platform;

    10.1.2 Remove, obscure, or alter any copyright, trademark, patent, or other notices or legends contained in the Platform or in any documentation or other materials produced, distributed, or published by Licensee;

    10.1.3 Distribute, rent, sell, lease, redistribute, release, or license the Platform or any part thereof to any third party or otherwise allow access by a third party, other than its authorized employees;

    10.1.4 Take or authorize any action that could detrimentally interfere with the performance of the Platform, use any robot, spider, or other device or process to monitor or copy the Platform, or knowingly transmit any virus or other potentially harmful device in connection with its use of Zero Hash Services; or

    10.1.5 Assist or encourage any third party to engage in any activity prohibited under Subsections 10.1.1 through 10.1.4 of this Agreement.

147302268.1

    **10.2**  *Restrictions on Use of Agent's Intellectual Property*. Agent offers individuals the ability to exchange fiat currency for bitcoin at a physical kiosks and store bitcoin in a hosted digital currency wallet (the "**Kiosk Service**"). Agent has exclusive ownership of and rights to the software used to provide the Kiosk Services (the "**Coinme Software**"), its use and content, as well as all related copyrights, trademarks, service marks, patent rights, and trade secrets and any other intellectual property rights therein (registered or unregistered). Licensee shall not:

        **10.2.1**  Copy, modify, create derivative works from, reverse engineer, reverse assemble, or reverse compile any technology included in the Coinme Software;

        **10.2.2**  Remove, obscure, or alter any copyright, trademark, patent, or other notices or legends contained in any documentation or other materials produced, distributed, or published by Agent;

        **10.2.3**  Distribute, rent, sell, lease, redistribute, release, or license the Coinme Software or any part thereof to any third party or otherwise allow access by a third party, other than its authorized employees;

        **10.2.4**  Take or authorize any action that could detrimentally interfere with the performance of the Coinme Software, use any robot, spider, or other device or process to monitor or copy the Coinme Software, or knowingly transmit any virus or other potentially harmful device in connection with its use of the Coinme Software; or

        **10.2.5**  Assist or encourage any third party to engage in any activity prohibited under Subsections 10.2.1 through 10.2.4 of this Agreement.

    **10.3**  *Licenses*. Subject to terms and conditions set forth in the Zero Hash LLC Platform Operator Agreement, Licensee hereby grants Agent a worldwide, royalty-free, fully paid up, non-exclusive license and right to access and use the Platform's application-programming interface for the purpose of allowing Agent to communicate with the Platform in order to perform the Services. Licensee and Agent each hereby grant the other the right to the other Party's trade names, logos, trademarks, service marks, or other indicia of origin as mutually agreed upon for marketing and compliance purposes. Any licenses or rights granted in this Subsection 11.3 shall automatically terminate with the termination of this Agreement.

**11.**  **Taxes.** Each Party agrees that each is solely responsible for its own federal, state, local, and foreign tax liabilities and filing requirements with respect to a tax of any kind resulting from this Agreement.

**12.**  **Miscellaneous.**

    **12.1**  *Amendments*. Agent acknowledges and agrees that notwithstanding any contrary provision in this Agreement, Licensee may, from time to time, amend this Agreement, including, without limitation, Appendix A, as Licensee shall deem reasonably necessary to comply with Applicable Law, at which time Licensee shall communicate to Agent the content of any such amendment. No later than five business days following Agent's receipt of any such notification from Licensee, Agent shall acknowledge its receipt of such notice and provide Licensee with evidence of its consent to such amendment in the manner specified

in the notice, following which this Agreement shall be amended in the manner specified in such amendment.

12.2   *Assignment*. Neither this Agreement nor any of the rights or obligations of either Party arising under this Agreement may be assigned or transferred without the prior written consent of the other Party except as otherwise provided in this Subsection 13.2. Notwithstanding any else in this Subsection 13.2 and to the extent permitted by Applicable Law, a Party may assign its rights and obligations under this Agreement to any entity: (1) controlling, controlled by, or under common control of the Party; or (2) which succeeds to all or substantially all of the assets and business of such Party, provided that, in the case of any such assignment by the Party, the assignee agrees in writing to assume the assignor's obligations under, and to be bound by the provisions of, this Agreement.

On the effective date of any valid assignment pursuant to this section, the assignor shall be released from all obligations and liabilities arising under this Agreement or, in case of a partial assignment, from all obligations and liabilities arising from the parts of this Agreement that have been assigned. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns in accordance with its terms.

12.3   *Scope of Agency*. Agent shall not provide "Money Transmission Services" that are outside the scope of those outlined in this Agreement in those jurisdictions specified in Appendix B, including those services provided in the capacity as an Authorized Delegate for any other licensed entity. For the purposes of this section, "Money Transmission Services" means any services or activity requiring licensing as a money transmitter, money services business, or similar status, with any state regulatory body.

12.4   *No Impact on Other Operations*. This Agreement shall not limit Agent's ability to offer products or services independent of its appointment as Licensee's Authorized Delegate. Nor shall this Agreement limit Agent's ability to in the future seek, obtain, and maintain additional money transmitter licenses.

12.5   *No Employer-Employee Relationship*. Agent shall not be considered an employee of Licensee by virtue of the Authorized Delegate relationship between the parties.

12.6   *Entire Agreement*. This Agreement, including all appendices, constitutes the entire agreement between the Parties for the Services and supersedes all other agreements, proposals, negotiations, and discussions, oral or written, relating to access to and use of the Services.

12.7   *Notices*. Each and every notice and consent required or otherwise given or made under this Agreement shall be in writing and shall be deemed given or made when personally delivered, when sent by confirmed fax, electronic mail, or three days after being sent by prepaid certified or registered mail to the last known address of the Party.

12.8   *Governing Law*. This Agreement shall be governed by and construed in accordance with the laws of Washington without giving effect to the conflict of law principles thereof.

12.9   *Severability; Waiver*. If any provision of this Agreement (or any portion thereof) is determined to be invalid or unenforceable, the remaining provisions of this Agreement

shall not be affected thereby and shall be binding upon the Parties and shall be enforceable, as though said invalid or unenforceable provision (or portion thereof) were not contained in this Agreement. The failure by any Party to insist upon strict performance of any of the provisions contained in this Agreement shall in no way constitute a waiver of its rights as set forth in this Agreement, at law or in equity, or a waiver of any other provisions or subsequent default by any other Party in the performance of or compliance with any of the terms and conditions set forth in this Agreement.

12.10  *Force Majeure*. Neither Licensee nor Agent shall have any liability for any failure to perform or delay in performing its obligations under this Agreement due to any act of God, act of governmental authority, change in law or regulation, war, criminal act, fire, explosion, earthquake, flood, weather condition, power failure, transportation, or other accident beyond the reasonable control of the Party.

12.11  *Headings*. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

12.12  *Construction*. The terms and provisions of this Agreement represent the results of negotiations among the Parties, each of which has been represented by counsel of its own choosing, and neither of which has acted under any duress or compulsion, whether legal, economic, or otherwise. Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties each hereby waive the application of any rule of law that would otherwise be applicable in connection with the interpretation and construction of this Agreement that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the Party whose attorney prepared the executed Agreement or any earlier draft of the same.

12.13  *Counterparts*. This Agreement may be executed and then delivered via facsimile transmission, via the sending of PDF or other copies thereof via email, and in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same Agreement.

12.14  *Survival*. All provisions of this Agreement which by their nature extend beyond the termination of this Agreement, including, without limitation, Sections 3-4 and 8-11, shall survive the termination or expiration of this Agreement.

[*Signature Pages Follow*]

**IN WITNESS HEREOF**, each of the parties hereto has caused this Agreement to be executed as of the Effective Date.

| **ZERO HASH LLC** | **COINME INC.** |
|---|---|
| BY: *Edward Woodford* (DocuSigned) | BY: *Neil Bergquist* (DocuSigned) |
| NAME: Edward Woodford | NAME: Neil Bergquist |
| TITLE: CEO | TITLE: CEO |
| EMAIL: edward@seedcx.com | EMAIL: neil@coinme.com |

147302268.1

## Schedule A – Fees

1. **Settlement Fee**: Licensee shall pay, each month, 7.5% of the percentage of the notational value of each transaction by Agent at an Authorized Delegate location.

147302268.1

## Appendix A - Services

**Effective Date: _____**

This Appendix A is a part of and incorporated into the Authorized Delegate Agreement, as may be amended from time to time, between Zero Hash LLC and Coinme Inc. All terms not defined in this Appendix A shall have the definition ascribed to them in the Authorized Delegate Agreement.

In order to provide a physical on-ramp to the hosted wallet and settlement services provided by Licensee's Platform, Licensee authorizes Agent, in its capacity as an Authorized Delegate of Licensee, to provide Kiosk Services on Licensee's behalf ("**Services**"). For the avoidance of doubt, Services does not include the hosted wallet and settlement services provided by Licensee's Platform. Agent may provide the Services as Licensee's Authorized Delegate at the approved locations listed in Appendix B.

The Services shall consist of four parts. The flow of funds for each part shall be as follows:

1. Deposits for Bitcoin Purchases

    TBI

2. Voucher Distribution

    TBI

3. Voucher Redemptions

    TBI

## Appendix B - List of Jurisdictions

**Effective Date:** _____

This Appendix B is a part of and incorporated into the Authorized Delegate Agreement, as may be amended from time to time, between Zero Hash LLC and Coinme Inc. All terms not defined in this Appendix B shall have the definition ascribed to them in the Authorized Delegate Agreement.

Licensee appoints Agent as its Authorized Delegate for purposes of performing the Services in the following jurisdictions:

| State |
|---|
|  |
|  |
|  |
|  |

The locations where Licensee authorizes Agent to perform the Services are listed in Appendix C.

147302268.1

**Appendix C - List of Locations**

**Effective Date:** _____

This Appendix C is a part of and incorporated into the Authorized Delegate Agreement, as may be amended from time to time, between Zero Hash LLC and Coinme Inc. All terms not defined in this Appendix C shall have the definition ascribed to them in the Authorized Delegate Agreement.

Licensee appoints Agent as its Authorized Delegate for purposes of performing the Services in the following locations:

|   | Retailer | Address | City | State | Zip |
|---|----------|---------|------|-------|-----|
| 1 |          |         |      |       |     |
| 2 |          |         |      |       |     |
| 3 |          |         |      |       |     |
| 4 |          |         |      |       |     |
| 5 |          |         |      |       |     |
| 6 |          |         |      |       |     |
| 7 |          |         |      |       |     |

147302268.1

**Appendix D - Additional Location Request**

This Appendix D is a part of and incorporated into the Authorized Delegate Agreement, as may be amended from time to time, between Zero Hash LLC and Coinme Inc. All terms not defined in this Appendix D shall have the definition ascribed to them in the Authorized Delegate Agreement.

By submitting this Additional Location Request, Agent is hereby requesting that Licensee appoint Agent as an Authorized Delegate at the locations listed below in accordance with the Authorized Delegate Agreement.

|   | Retailer | Address | City | State | Zip | Add/Delete |
|---|---|---|---|---|---|---|
| 1 |  |  |  |  |  |  |
| 2 |  |  |  |  |  |  |
| 3 |  |  |  |  |  |  |
| 4 |  |  |  |  |  |  |
| 5 |  |  |  |  |  |  |
| 6 |  |  |  |  |  |  |
| 7 |  |  |  |  |  |  |

Agent understands and agrees that submission of this form alone does not permit Agent to operate as an Authorized Delegate in the above locations.

Requested By: _____
Title: _____
Signature: _____
Date: _____

147302268.1

## Appendix E - State Addenda

**Effective Date:** ___

This Appendix E is a part of and incorporated into the Authorized Delegate Agreement, as may be amended from time to time, between Zero Hash LLC and Coinme Inc. For each new jurisdiction, this Appendix E shall outline, at a minimum, additional obligations imposed on the Parties, including any jurisdiction-specific requirements and associated fees. All terms not defined in this Appendix E shall have the definition ascribed to them in the Authorized Delegate Agreement.

With respect to Agent's provision of the Services in the following jurisdictions, Agent shall: