# Exhibit B
## Zero Hash LLC Platform Operator Agreement

DocuSign Envelope ID: 4218AD6B-B51F-45DA-8564-2F1514273DE6

# zero#

# Zero Hash LLC Platform Operator Agreement

Zero Hash LLC Platform Operator Agreement



# Table of Contents

1. Definitions ................................................................................................................. 3

2. Overview ................................................................................................................... 4

3. Zero Hash Services ................................................................................................. 4
   3.1. Customer Onboarding and Approval ................................................................ 4
   3.1.1. Performance of AML/KYC Review by Zero Hash ........................................... 4
   3.2. Platform Operator Submission of Transactions to Zero Hash ........................... 5
   3.3. Zero Hash Settlement Processing of Submitted Trades .................................... 5
   3.4. Customer Default ............................................................................................. 5
   3.5. Customer Withdrawal of Funds ........................................................................ 5

4. Authorized Delegate Relationship ........................................................................ 6

5. Platform Operator Representations ....................................................................... 6
   5.1. Binding Obligation .......................................................................................... 6
   5.2. Accessing the Platform .................................................................................... 6
   5.3. Compliance with Applicable Law ..................................................................... 7
   5.3.1. Prohibited Persons ...................................................................................... 7
   5.3.2. Identity Verification and Screening ............................................................. 8
   5.3.3. GDPR Compliance ...................................................................................... 8
   5.4. Risk ................................................................................................................ 8
   5.5. Security ........................................................................................................... 9
   5.6. Status of Zero Hash ........................................................................................ 10
   5.7. Zero Hash Authority ........................................................................................ 10
   5.8. Use of the Platform ......................................................................................... 10
   5.9. Use of Third Parties ........................................................................................ 11

6. Zero Hash Representations .................................................................................... 11

7. Fees, Settlement and Payment .............................................................................. 11
   7.1. Calculation of Settlement Fees ........................................................................ 12

8. Intellectual Property and Transaction Data .......................................................... 12
   8.1. Intellectual Property ........................................................................................ 12
   8.2. Settlement Data .............................................................................................. 12

9. Disclaimer of Warranty and Limitation of Liability ............................................... 13

10. Indemnification ..................................................................................................... 13
   10.1. Indemnification by Zero Hash ........................................................................ 13
   10.2. Indemnification by Platform Operator ............................................................. 14

11. Governing Law ...................................................................................................... 14

12. Confidentiality ....................................................................................................... 14

13. Term and Termination ........................................................................................... 15
   13.1. Term .............................................................................................................. 15
   13.2. Termination .................................................................................................... 15

14. Assignment ........................................................................................................... 16

15. Miscellaneous ....................................................................................................... 16

Schedule A – Zero Hash Fees .................................................................................... 18

Appendix A ................................................................................................................. 19

Appendix B ................................................................................................................. 20



This **Zero Hash LLC Platform Operator Agreement** (the "**Agreement**"), is entered into by and between Zero Hash LLC ("**Zero Hash**" or "**Company**") and Coinme Inc. ("**Platform Operator**") and is effective as of the date and time at which Platform Operator indicates its acceptance electronically (the "**Effective Date**"). For purposes of this Agreement, Zero Hash and Platform Operator are collectively referred to as the "Parties."

# 1.  Definitions

**Account** means a segmented ledger of Fiat Currency or Digital Assets held in the name of a Customer or Participant for a particular purpose.

**Address** means the alphanumeric character string that is used to designate the destination address to which any Digital Asset is to be transferred.

**Applicable Law** means, in respect of any person or entity, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such person or entity, and all orders and decrees of all courts and arbitrators in proceedings or actions to which the person or entity in question is a party or by which it or its properties are bound.

**Blockchain** means the ledger of record that is created and maintained using distributed ledger technology to record transfers of a particular Digital Asset. If there are multiple ledgers, or there is otherwise any disagreement about which ledger is the ledger of record for a particular Digital Asset, the ledger recognized by Zero Hash as the ledger of record will be the "Blockchain" for that Digital Asset for all purposes under this Agreement.

**Calculation and Settlement Agent Services** means making determinations relating to (1) any adjustments, Variation Margin, disruptions, valuations, settlements and compressions that occur throughout the duration of the Transaction, and (2) Fiat Currency or Digital Asset amounts that must be paid to/from a Participant to fully close out all obligations due to the particular Transaction.

**Customer** means a customer of Platform Operator on whose behalf Platform Operator reports trades to Zero Hash for settlement. A Customer of Platform Operator must also be a Participant.

**Customer Account** means any account maintained on the Zero Hash Platform that holds any Fiat Currency or Digital Asset on behalf of a Customer or Participant.

**Digital Asset** means any cryptocurrency, cryptographic token or other digital right or asset, and, as applicable based on context, a quantity (whether multiple, fraction or fragment) of the units by which any such cryptocurrency, cryptographic token or other digital right or asset are denominated.

**External Address** means an Address that is not associated with any System Wallet.

**Fiat Currency** means currency which a government has declared to be legal tender which is not backed by a physical commodity.

**Final Settlement** means a Fiat Currency or Digital Asset amount that must be paid to/from a Customer or Participant to fully close out all obligations due to the particular Transaction.

**Force Majeure** means any Act of God, act of governmental authority, change in law or regulation, war, criminal act, fire, explosion, earthquake, flood, weather condition, power failure, transportation or other accident beyond the reasonable control of the party.

**Participant** means a participant of Zero Hash that has signed the Zero Hash LLC Services Agreement, and may include the Platform Operator.

**Platform Operator Platform** is an exchange, matching mechanism or matching platform, a request-for-quote system, a brokerage network, or a combination of the foregoing, through which Customers may enter into agreements to buy or sell Digital Assets or other Supported Assets to and from each other and or to or from Platform Operator.

**Platform Protocol** means the documentation, procedures, requirements, conditions, practices and guidelines for the use of Zero Hash Services, prepared by or on behalf of Zero Hash describing any processes, procedures, know-how or algorithms developed, devised, practiced or used by Zero Hash in its capacity in relation to this Agreement.

Zero Hash LLC Platform Operator Agreement



**Private Key** means the alphanumeric character string that is required to transfer any Digital Asset but is not required to be disclosed in order to transfer the Digital Asset.

**Proper Instructions** means instructions provided by Platform Operator to Zero Hash in accordance with the requirements of this Agreement.

**Supported Asset** means any assets with respect to which Zero Hash is willing to provide calculation and settlement services under this Agreement, as determined at Zero Hash's discretion from time to time.

**Transaction** means any trade matched or executed by Platform Operator on the Platform Operator Platform between Customers or between a Customer and Platform Operator and reported to Zero Hash for settlement.

**Settlement Data** means information related to the settlement of Transactions executed on or through Platform Operator Platform.

**Wallet** means any software, application, service, device or tangible object that is used to record and store Private Keys for Digital Assets that are associated with the Wallet.

**Wallet Provider** means any entity, person, or organization that Zero Hash contracts with and that provides Zero Hash with Wallet services for Digital Assets supported by Zero Hash.

**Zero Hash Platform** means (1) the software, services, hardware, network systems and infrastructure, and other items owned or controlled by Zero Hash used to establish Customer Accounts, allocate and hold Digital Assets in Accounts, and provide the other services contemplated by this Agreement; (2) the interface through which Customers and Participants can fund their Account, track movements of Digital Assets and Fiat into and out of their Accounts, and request withdrawals; and (3) the software, services, hardware, network systems and infrastructure, and other items owned or controlled by Zero Hash used by Platform Operator to settle Transactions executed through or on the Platform Operator Platform, and provide the other services contemplated by this Agreement.

**Zero Hash Services** means the services described in the Zero Hash Services section of this Agreement.

# 2. Overview

Platform Operator provides Customers its Platform Operator Platform. Zero Hash provides calculation and settlement agent services for Digital Assets or other Supported Assets. Pursuant to this Agreement, Platform Operator will report trades completed on the Platform Operator Platform to Zero Hash for calculation and settlement of obligations owed between Customers or between a Customer and Platform Operator in relation to each trade reported by Platform Operator to Zero Hash. In exchange for performing its calculation and settlement services, Platform Operator shall pay to Zero Hash the fees listed in Schedule A, below.

# 3. Zero Hash Services

## 3.1. Customer Onboarding and Approval

The Parties agree that each Customer onboarded to that Party's platform will agree to the terms of service as provided by such Party. Platform Operator shall direct Customer to Zero Hash in order to permit Zero Hash to perform an Anti-Money Laundering and Know-Your-Customer ("AML/KYC") review on such Customer as described below. Zero Hash may determine to use the applicant information provided by Platform Operator or may request new information from the applicant. Zero Hash reserves the right to reject an applicant for any reason or no reason at all. Once approved by Zero Hash and Platform Operator, a Customer's Transactions executed on Platform Operator Platform may be reported to Zero Hash's Platform for calculation and settlement services.

### 3.1.1. Performance of AML/KYC Review by Zero Hash

In exchange for the fees described in Schedule A hereto, Platform Operator hereby contracts Zero Hash to conduct AML/KYC onboarding reviews associated with applicants that are requesting to become Customers of Platform Operator. For the avoidance of doubt, such AML/KYC onboarding shall consist of the reviews



required by applicable laws relating to customer identification procedures. Zero Hash shall inform Platform Operator when a Customer has been successfully onboarded to the Zero Hash Platform. Zero Hash shall notify Platform Operator in the case that any applicant fails to meet any regulatory requirements pursuant to applicable law relating to AML/KYC reviews. The Parties agree that Zero Hash shall not be liable to Platform Operator in any way ever for any failure in conducting such AML/KYC onboarding and shall not be required to indemnify Platform Operator in the case of any action taken by any regulatory agency having authority over Platform Operator for failure to properly conduct required AML/KYC onboarding.

## 3.2. Platform Operator Submission of Transactions to Zero Hash

With regard to any Transaction matched by Platform Operator on Platform Operator Platform and intended to utilize Zero Hash's settlement system, such Transaction must be transmitted to Zero Hash in accordance with this Agreement. Upon the matching of a buy and sell order on Platform Operator Platform, Platform Operator shall, in a form and manner acceptable to Platform Operator, notify its customers of the matched trade and its intention to transmit such matched trade to Zero Hash for settlement. Such notification may be provided as a trade confirmation or similar statement. Thereafter, Platform Operator shall send details of the Transaction to Zero Hash in a form and manner mutually agreed upon by the Parties.

## 3.3. Zero Hash Settlement Processing of Submitted Trades

Upon receipt of a Transaction submitted to Zero Hash by Platform Operator, Zero Hash shall confirm the Transaction to the Platform Operator and save the details of the Transaction in its records. Upon confirmation, Zero Hash shall calculate the Final Settlement obligations of the Customers or Participants involved in the Transaction and will then notify the Customers or Participants of their Final Settlement obligations. The Customers or Participants involved in each submitted Transaction will then be prompted to login to the Zero Hash Platform and deposit the Fiat Currency or Digital Assets as required by the trade confirmation. Zero Hash shall provide Customers or Participants with a deposit receipt indicating the time and quantity (of Fiat Currency or Digital Assets) of their deposits. Upon receipt by Zero Hash within the prescribed settlement timeframe of the full amount of the Final Settlement obligation as calculated by Zero Hash, Zero Hash shall then perform settlement of the transaction. If the Customers or Participants have sufficient balance in their Zero Hash accounts at the time of the receipt of a Transaction, Zero Hash shall settle the transaction. Through the settlement process, the Fiat Currency and Digital Assets of the Customers or Participants subject to the Transaction shall be transmitted by Zero Hash, at which point Zero Hash shall send the Platform Operator and Customers or Participants notification that the Transaction has settled successfully.

## 3.4. Customer Default

In the event that Customer or a Participant does not deposit sufficient Fiat Currency or Digital Assets as calculated by Zero Hash for Customer or Participant to meet its Final Settlement obligation by the settlement cut-off time, as published by Zero Hash from time to time, Zero Hash shall consider Customer or Participant to be in default. Once a Customer or Participant is considered to have defaulted, Zero Hash will cancel the trade for which the Customer or Participant has defaulted and send notification to Platform Operator and both parties involved in the transaction.

## 3.5. Customer Withdrawal of Funds

Customers or Participants may withdraw funds (Fiat Currency or Digital Assets) from Zero Hash by using the Zero Hash Platform. Customers or Participants may withdraw funds in accordance with the Zero Hash LLC Services Agreement and pursuant to any relevant materials published by Zero Hash.



# 4.  Authorized Delegate Relationship

Concurrent with the execution of this agreement, Zero Hash and Platform Operator shall enter the Zero Hash Authorized Delegate Agreement. shall enter into an Authorized Delegate Agreement concurrent with the execution of this Agreement.

# 5.  Platform Operator Representations

On the Effective Date and at all times during the term of this Agreement, Platform Operator represents, warrants and covenants to the following:

## 5.1.  Binding Obligation

Platform Operator has the right and full corporate power to enter into this Agreement, and this Agreement creates a legal, valid and binding obligation of Platform Operator which is enforceable against Platform Operator in accordance with its terms.

## 5.2.  Accessing the Platform

1.  Platform Operator acknowledges that reporting a trade on behalf of Customers and Participants to the Zero Hash Platform creates a binding obligation between such Customers or between such Customer and Participant.

2.  Platform Operator shall take all reasonable care to safeguard its User IDs and will not authorize or permit any other party to access the Platform using the User ID, other than the Person to which the User ID was issued. Platform Operator further acknowledges that it is responsible for maintaining adequate security and control of all account passwords in relation to Platform Operator's use of the Zero Hash services.

3.  Platform Operator will notify Zero Hash immediately of any changes in the authorized level of access for any administrator of Platform Operator's User ID.

4.  Platform Operator acknowledges that Zero Hash may rely upon, and will be fully released and discharged by Platform Operator for acting upon, any information, data, Transaction details, acknowledgements or instructions that are (i) entered, imported, transmitted or otherwise communicated under its User IDs (whether or not such action was actually authorized by Platform Operator), or (ii) are otherwise reasonably believed by Zero Hash to be genuine and to have been communicated or presented on behalf of Platform Operator through Platform Operator's User ID.

5.  Platform Operator acknowledges that Transactions submitted by Platform Operator on a Customer's behalf or on a Participant's behalf may be subject to federal and state laws and regulations governing transactions in currency and other monetary instruments relating to money laundering activities and the funding of terrorism and that such laws and regulations may impose severe criminal penalties on those who participate or assist in such activities or in structuring of such activities to avoid reporting requirements. Platform Operator acknowledges that Zero Hash or any of its affiliates may monitor transactions for compliance with such laws and regulations. Provided, further, Platform Operator agrees that Platform Operator will not initiate any action which would violate, or result in a payment in violation of the federal and state laws or regulations, including, without limitation, the federal laws and regulations administered by bank regulatory agencies and the Office of Foreign Assets Control ("OFAC") relating to money laundering and the funding of terrorism.

6.  Platform Operator acknowledges that each Customer and Participant will be individually required to enter into the Zero Hash LLC Services Agreement, or successor agreement thereto ("Services Agreement"), with Zero Hash. Platform Operator shall not report trades to Zero Hash on behalf of any Customer or Participant without first ensuring that such Customer or Participant has entered into the Services Agreement with Zero Hash.



## 5.3.  Compliance with Applicable Law

1.  Platform Operator shall comply with any Applicable Law with regard to Platform Operator's activity pursuant to this Agreement.

2.  Platform Operator acknowledges and agrees that, to the extent any obligations are imposed on Platform Operator but are performed by Zero Hash, Platform Operator shall remain solely responsible for such compliance.

3.  Platform Operator has obtained all registrations and/or licenses required to use Zero Hash Services under Applicable Law.

4.  Platform Operator is not legally or otherwise prohibited from using Zero Hash Services as described in this Agreement.

5.  Platform Operator will provide all information to Zero Hash as requested by Zero Hash and/or required by Applicable Law in connection with Platform Operator's and Customers' or Participants' use of Zero Hash Services. All information provided by Platform Operator to Zero Hash is and shall be truthful and not omit any fact which would otherwise make what was stated false or misleading.

6.  Platform Operator acknowledges and agrees that, notwithstanding the confidentiality obligations set forth in the Confidentiality section, Zero Hash may provide information regarding Platform Operator to any regulatory or governmental agency or court of competent jurisdiction as required by Applicable Law.

7.  Neither Platform Operator nor any Customer or Participant:

    a.  Is located in, under the control of, or a national or resident of any country to which the United States has embargoed goods or services;

    b.  Has been identified as a "Specially Designated National" by the Office of Foreign Assets Control;

    c.  Has been placed on the U.S. Commerce Department's Denied Persons List;

    d.  Will use Zero Hash Services if any Applicable Law in Platform Operator's, Customer's, or Participant's country prohibit Platform Operator, Customer, or Participant from doing so in accordance with this Agreement.

8.  Neither the execution of nor performance under this Agreement by Platform Operator violates any law, rule, regulation or order, or any agreement, document or instrument, binding on or applicable to Platform Operator.

9.  Platform Operator acknowledges that Zero Hash reserves the right to cancel a Transaction or close any Customer Account if Zero Hash reasonably suspects that the Transaction or account involves money laundering, terrorist financing, fraud or any other type of financial crime.

10. Concurrently with the execution of this Agreement, and from time to time thereafter, as appropriate, Platform Operator will deliver to Zero Hash an officer's certificate setting forth the names, titles, signatures and scope of authority of all individuals authorized to give Proper Instructions or any other notice, request, direction, instruction, certificate or instrument under this Agreement. The certificate may be accepted and conclusively relied upon by Zero Hash and will be considered to be in full force and effect until receipt by Zero Hash of a similar certificate to the contrary and Zero Hash has had a reasonable time to act thereon.

11. Platform Operator represents that sharing Customer information with Zero Hash in accordance with the section titled Customer Onboarding and Approval does not violate any Applicable Law or any contractual obligation that Platform Operator is subject to or bound by.

### 5.3.1.  Prohibited Persons

The Parties will endeavor to ensure that no Customer or Participant is a Prohibited Person. "**Prohibited Person**" means any person or entity that: (a) is on the Specially Designated Nationals and Blocked Persons list maintained by the U.S. Office of Foreign Assets Control, the U.S. Department of Commerce Denied Persons list, or any similar list of persons or entities with which any transactions or business activities are prohibited or limited issued by any U.S. governmental authority or any other governmental authority having jurisdiction over Zero Hash; or (b) is located in, or a citizen or resident of any state, country, territory or other jurisdiction: (i) that is embargoed by the United States, (ii) where use of the Zero Hash Platform would be illegal or otherwise violate any Applicable Law.

DocuSign Envelope ID: 4218AD6D-D51E-45DA-8564-2F1514273DE6

Zero Hash LLC Platform Operator Agreement



### 5.3.2. Identity Verification and Screening

Zero Hash will implement and apply identity and other screening and verification procedures that comply with Applicable Law and any anti-money laundering, Know-Your-Customer (KYC), anti-terrorism financing, and fraud protection requirements. Upon reasonable request, Platform Operator will store and make available to Zero Hash or any governmental authority with jurisdiction any information provided by Platform Operator as required by Applicable Law. Zero Hash reserves the right to refuse any Customer if, in Zero Hash's sole discretion, Zero Hash determines that permitting such Customer access to use the Zero Hash Platform would violate any rule, regulation, law, court order, or similar requirement.

### 5.3.3. GDPR Compliance

Zero Hash is subject to the European Union's General Data Privacy Regulation [Regulation (EU) 2016/679] (the "GDPR") when Zero Hash is a "controller" or "processor" of "personal data" from an individual "data subject" located in the European Union, as those terms are defined in the GDPR. Platform Operator acknowledges and agrees that, when acting as a "processor" of "personal data" for Zero Hash under this Agreement, all applicable requirements of the GDPR are incorporated by reference as material terms of this Agreement. Platform Operator represents and warrants that (1) it is aware of and understands its compliance obligations as a "processor" under GDPR; (2) it has adopted a GDPR compliance policy/program, a copy of which has been provided to Zero Hash; (3) it will process "personal data" only in accordance with the GDPR; and (4) with regard to its obligations under this Agreement, it shall comply with all applicable requirements of the GDPR to the same extent as required for Zero Hash. Additionally, Platform Operator shall indemnify and hold Zero Hash, its directors, officers, and employees harmless from and against any claims, demands, suits, damages, penalties, fines, or costs arising from any violation of GDPR by Platform Operator.

## 5.4. Risk

1. Platform Operator understands that Zero Hash is not liable for price fluctuations in any Digital Asset or Supported Asset.

2. By using the Platform, Platform Operator acknowledges and agrees that:

   a. Zero Hash is not responsible for the operation of Digital Asset underlying protocols, and Zero Hash makes no guarantee of their functionality, security, or availability; and

   b. The Digital Asset underlying protocols are subject to sudden changes in operating rules (a/k/a "forks"), and such forks may materially affect the value, function, and/or even the name of the Digital Asset stored with Zero Hash.

   c. Zero Hash does not own or control the underlying software protocols which govern the operation of any Digital Asset. In general, the underlying protocols are open source and anyone can use, copy, modify, and distribute them.

3. In the event of a market disruption or Force Majeure Event:

   a. Zero Hash may do one or more of the following:

      i. Suspend access to the Zero Hash Services and Zero Hash Platform; or

      ii. Prevent Platform Operator from completing any actions via the Zero Hash Services or Zero Hash Platform.

   b. Zero Hash will not be liable for any losses suffered by Platform Operator or Customers resulting from such actions.

   c. Following any such event, Platform Operator acknowledges that prevailing market prices may differ significantly from the prices available prior to such event.

4. Platform Operator acknowledges that Customers and Participants must post or collect sufficient Fiat Currency or Digital Assets to cover their Final Settlement obligations within the timeframe permitted by Zero Hash. Platform Operator will make every available effort to ensure that all Final Settlement obligations are covered by such time.

DocuSign Envelope ID: 4218AD6B-B51F-45DA-9564-2F1514273DF6

Zero Hash LLC Platform Operator Agreement



5. Platform Operator acknowledges settlements on a Digital Asset's Blockchain are largely irreversible without the consent and active participation from the recipient. Once a transaction has been recorded on a Digital Asset's Blockchain, an incorrect transfer or theft of the Digital Asset will not be reversible, and Platform Operator, Customer, or Participant may not be able to seek compensation or appeal to government resources for recovery of such transfers or theft.

6. Platform Operator acknowledges that Zero Hash shall have no responsibility or liability for: (a) events or circumstances beyond the reasonable control of Zero Hash, including, without limitation, the interruption, suspension or restriction of trading on or the closure of any Digital Asset market or system, power or other mechanical or technological failures or interruptions, computer viruses or communications disruptions, work stoppages, natural disasters, acts of war, revolution, riots or terrorism or other similar force majeure events; (b) any error by any Platform Operator; (c) the insolvency of, or acts or omissions by, a Digital Asset trading platform or market or the issuer of any Digital Asset; (d) any error, or any loss, destruction, corruption or other inability to use or transfer any Digital Asset caused by the applicable Blockchain or any other technology used to implement or operate any Digital Asset, or other circumstances beyond the reasonable control of Zero Hash; (e) the failure of any Platform Operator to adhere to Zero Hash's operational policies and procedures; (f) any delay or failure of any Digital Asset issuer, the developer or operator of any technology used to implement or operate any Digital Asset, or any broker, agent, intermediary, bank or other commercially prevalent Digital Asset payment or clearing system to provide any information or services required in order to enable Zero Hash's performance hereunder; (g) delays or inability to perform its duties due to any disorder in market infrastructure with respect to any particular Digital Asset; (h) the effect of any provision of any law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or of any court of competent jurisdiction, and (i) any other matters for which Zero Hash is not responsible under this Agreement.

7. Platform Operator acknowledges that neither Zero Hash nor any Wallet Provider will be responsible for any Digital Asset which is not received by Wallet Provider or which is sent to an External Address in accordance with Platform Operator's, Customer's, or Participant's instructions.

8. Platform Operator acknowledges that Zero Hash has no duty to assess or take any responsibility for the suitability or appropriateness of the investments made by Platform Operator or any Customer or Participant. Zero Hash has no duty to ensure or to inquire whether Platform Operator or any Customer or Participant complies with any investment objectives or restrictions under any Applicable Law, including laws intended to protect the interests of investors.

9. Platform Operator acknowledges that Zero Hash does not own or control the underlying software protocols which govern the operation of Digital Assets. Digital Asset protocols are subject to changes in protocol rules (referred to as "forks"), and that such forks may materially affect the value, function, or name of the Digital Asset. Platform Operator acknowledges and agrees (i) that Zero Hash is not responsible for operation of the underlying Digital Asset protocols and that Zero Hash makes no guarantee of their functionality, security, or availability; and (ii) if a fork occurs, Zero Hash may temporarily suspend the Zero Hash Services relating to the Digital Asset affected, and Zero Hash may configure or reconfigure its Zero Hash Services or decide not to support the forked protocol entirely, but allow Platform Operator to transfer the affected Digital Asset.

10. Platform Operator acknowledges that trading Digital Assets involves substantial risk and that the value of Digital Assets is not guaranteed by Zero Hash or any other organization and that Zero Hash is not liable or responsible for losses suffered by Platform Operator or any other person or entity due to a change in price of any Digital Asset.

11. Platform Operator acknowledges that Zero Hash is not a clearinghouse and does not guarantee trades submitted to Zero Hash by Platform Operator or any other person.

# 5.5. Security

1. Platform Operator represents that it has security systems and compliance procedures in place to prevent violation of Applicable Law and unauthorized access, use or misuse of the Zero Hash Services including, without limitation, not knowingly or negligently introducing or permitting to be introduced any computer viruses, worms, or other harmful codes into any of the systems or technology maintained, operated or used by Zero Hash in performance of providing the Zero Hash Services.

DocuSign Envelope ID: 4218AD6B-B51F-46DA-9564-2F1514273DF6

Zero Hash LLC Platform Operator Agreement



2. Platform Operator represents that it will notify Zero Hash immediately if Platform Operator becomes aware of any unauthorized access to or use of the Zero Hash Services.

3. Platform Operator represents that it will not alter, delete, disable or otherwise circumvent any security device.

4. Notification of breach: If at any time any personally identifying information or confidential information has been lost, stolen or misused or Parties believe that the security of communications between Parties may be or has been compromised or is in any way insecure, Platform Operator must notify Zero Hash immediately (with confirmation in writing) and assist Zero Hash in investigating and remedying the situation. Platform Operator's notice will not affect any action taken by Zero Hash, including transfers made or instructions carried out prior to the time Zero Hash has received the notice and have had a reasonable opportunity to act on it.

## 5.6.  Status of Zero Hash

1. Platform Operator acknowledges that Zero Hash is not a counterparty to any transaction submitted to Zero Hash by Platform Operator.

2. Platform Operator acknowledges that Zero Hash does not provide advice with respect to whether counterparties should or should not enter into any particular transaction. Zero Hash's relationship with Platform Operator is limited to providing the Zero Hash Services.

3. Platform Operator acknowledges that Zero Hash will act in good faith and without negligence and will be held to the exercise of reasonable care, prudence and diligence.

4. Platform Operator acknowledges that Zero Hash is not prohibited from accepting Customers as its own customers or as customers of any of its affiliates.

## 5.7.  Zero Hash Authority

Platform Operator acknowledges and authorizes Zero Hash to, and agrees that Zero Hash shall have the authority to, take all actions it considers necessary or appropriate to, among other things:

1. Establish and enforce the Platform Protocol;

2. Maintain records of all activities relating to the business of Zero Hash and all activities conducted on the Zero Hash Platform;

3. Provide information regarding Platform Operator or any Customer as required under Applicable Law;

4. Perform any other Zero Hash Services; and

5. Contract with any qualified third party service provider for the provision of the Zero Hash Services, subject to Applicable Law.

## 5.8.  Use of the Platform

1. Platform Operator will not attempt to access information that Platform Operator has not been authorized to use by Zero Hash. If Platform Operator inadvertently gains such access, Platform Operator agrees not to use, disseminate, reproduce, redistribute or decompile any such information or applications.

2. Platform Operator will not use the Platform or any feature of the Platform to post or transmit inappropriate information, including without limitation any information that may be deemed obscene, libelous, harassing, fraudulent, or slanderous, or post or transmit any information, software, or other material that is an invasion of privacy or publicity rights, or which is protected by copyright, trademark, service mark, database right or other proprietary right, unless first obtaining the permission of the owner or right holder.

3. Platform Operator acknowledges and agrees that Zero Hash may monitor Platform Operator's use of the Platform and may monitor and tape record telephone conversations with Platform Operator concerning its use of the Platform. In each case, Platform Operator acknowledges and agrees that Zero Hash may use



any resulting information for its internal purposes at its discretion, subject to the confidentiality provisions in the Confidentiality Section of this Agreement.

4.  Platform Operator acknowledges that Zero Hash may refuse to process or cancel any Transaction as required by law or in response to a subpoena, court order, or other binding government order. Moreover, Zero Hash may initiate the transfer of any Digital Asset if required by law or in response to a subpoena, court order, or other binding government order.

## 5.9.  Use of Third Parties

To the extent Platform Operator uses any third parties or agents in connection with Platform Operator's use of Zero Hash Services or compliance with Applicable Law in connection with Platform Operator's use of Zero Hash Services, Platform Operator will disclose such use to Zero Hash, identify such third parties or agents upon request by Zero Hash and remain jointly and severally liable for the conduct of any such third parties or agents.

# 6.   Zero Hash Representations

Zero Hash represents and warrants to Platform Operator that:

1.  Zero Hash has the right and full corporate power to enter into this Agreement and that this Agreement creates legal, valid and binding obligations on it which are enforceable against it in accordance with its terms;

2.  Zero Hash Services do not infringe on any patent, trademark, or copyright of a third party;

3.  Zero Hash is a legal entity;

4.  Zero Hash is not a Covered Swap Entity, as that term is defined in the Code of Federal Regulations;

5.  Zero Hash is not a counterparty to any Transaction;

6.  Zero Hash is not a margin affiliate of any Covered Swap Entity, as that term is defined in the Code of Federal Regulations, or counterparty to any Transaction;

7.  Zero Hash does not facilitate the trading or execution of any swap, forward, option, future, derivative or any other type of contract between persons, and is not an organized exchange or other trading facility;

8.  Zero Hash will make reasonable efforts to ensure that either Zero Hash or the Wallet Provider operates a full node for each Digital Asset listed by the supported by Zero Hash in order to prevent fraud or error on deposit (i.e., to prohibit the deposit of the incorrect Digital Asset into a particular wallet); and

# 7.   Fees, Settlement and Payment

Platform Operator acknowledges and accepts that it shall be solely responsible for any and all costs or expenses associated with its receipt of Zero Hash Services. Platform Operator agrees to pay any and all fees incurred from using Zero Hash Services, as set forth in Schedule A attached hereto ("**Fees**"), without deduction or setoff. In addition, Platform Operator shall pay for all third-party telecommunication and other charges to use Zero Hash Services. Zero Hash may deduct Fees at the time of service and/or may provide each Platform Operator an invoice of all such Fees on a monthly or other basis determined by Zero Hash from time to time, which amounts shall be due, unless otherwise specifically stated, ten (10) calendar days from the date Zero Hash sent the invoice to Platform Operator.

Platform Operator shall pay all taxes, levies or duties resulting from this Agreement including sales tax or similar tax but excluding tax solely on Zero Hash's net income. All Fees quoted and payments made hereunder shall be in U.S. Dollars, and all Fees are non-refundable and non-creditable. Late payments shall bear an interest rate per annum equal to the Prime Rate (as published in the Wall Street Journal on the day such payment becomes delinquent) plus 1.5 per cent, to the extent that such rate shall not exceed the maximum rate allowed by Applicable Law from the date due until paid in full; provided, however, that if the published Prime Rate is less than zero, the Prime Rate will be calculated as being equal to zero per annum. Zero Hash



may cease providing Zero Hash Services to Platform Operator for failure to pay Fees due to Zero Hash within thirty (30) days of becoming due and such cessation of services shall last for as long as such Fees remain unpaid.

## 7.1.  Calculation of Settlement Fees

Settlement Fees are calculated by assessing the settlement fee rate against the notional value of each Transaction submitted by Platform Operator. Instructions regarding how Zero Hash applies its Settlement Fee to foreign currency and Digital Asset transactions can be found on Zero Hash's public website at www.seedcx.com.

# 8.  Intellectual Property and Transaction Data

## 8.1.  Intellectual Property

Zero Hash has exclusive ownership of and rights to the Platform Protocol, their use and content, as well as all related copyrights, trademarks, service marks, patent rights, and trade secrets and any other intellectual property rights therein (registered or unregistered) including any applications anywhere in the world.

Platform Operator will not:

1.  Copy, modify, create derivative works from, reverse engineer, reverse assemble or reverse compile any technology used to perform Zero Hash Services or otherwise included in the Platform Protocol;

2.  Remove, obscure or alter any copyright, trademark, patent or other notices or legends contained in the Zero Hash Platform or in any documentation or other materials produced, distributed or published by Zero Hash;

3.  Distribute, rent, sell, lease, redistribute, release or license the Platform Protocol or any part thereof to any third party or otherwise allow access by a third party, other than its authorized employees;

4.  Take or authorize any action that could detrimentally interfere with the performance or delivery of Zero Hash Services, use any robot, spider or other device or process to monitor or copy the Platform, or knowingly transmit any virus or other potentially harmful device in connection with its use of Zero Hash Services; or

5.  Assist or encourage any third party in engaging in any activity prohibited under the Platform Protocol.

## 8.2.  Settlement Data

Zero Hash shall be entitled, in its sole discretion, to use Settlement Data to develop and compile market data that Zero Hash, or a third-party service provider that Zero Hash may utilize for such purpose, may disseminate to third parties (including through a market data feed) for business purposes without further consent of any Platform Operator, Customer, Participant or other Person, and Zero Hash shall be entitled to any and all revenue derived therefrom. By its use of Zero Hash Services, each Platform Operator consents to such use by Zero Hash of Settlement Data. Any such market data disseminated by Zero Hash, or its third-party service provider, shall be disseminated in an anonymous fashion and shall not identify the Platform Operator, Customers, or Participants who provided or entered into Transactions leading to Settlement Data.

Other than for its own internal use in accordance with this Agreement, Platform Operator will not communicate, disclose, redistribute, or otherwise furnish (or permit to be communicated, disclosed, redistributed or otherwise furnished) all or any portion of the Settlement Data, in any format, to any third party (other than to its authorized employees subject to and in strict accordance with this Agreement) or for the purposes of constructing or calculating the value of any index or indexed products or for the purpose of creating any derivative works or to make any use whatsoever at any time of the Settlement Data that could compete with the business of Zero Hash or performance of Zero Hash Services. Notwithstanding the foregoing, Platform Operator understands and agrees that any and all data submitted to Zero Hash by Platform Operator or its authorized employees



and all information related to Transactions entered into by Customers or Participants on Platform Operator Platform and transmitted to Zero Hash pursuant to this Agreement shall be the joint and exclusive property of Zero Hash and Platform Operator, and Zero Hash shall have the right to use, sell, retransmit or redistribute such information, on an anonymous and aggregated basis, in accordance with and subject to the confidentiality terms set forth in the Confidentiality section of this Agreement.

# 9.   Disclaimer of Warranty and Limitation of Liability

PLATFORM OPERATOR ACKNOWLEDGES, UNDERSTANDS, AND ACCEPTS THAT THE ZERO HASH SERVICES ARE PROVIDED ON AN "AS IS" BASIS AT PLATFORM OPERATOR'S SOLE RISK. ZERO HASH EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OTHER THAN AS EXPRESSLY STATED HEREIN. NEITHER ZERO HASH NOR ITS DIRECTORS, MANAGERS, OFFICERS, AFFILIATES, SUBSIDIARIES, SHAREHOLDERS, EMPLOYEES OR AGENTS MAKE ANY WARRANTY WITH RESPECT TO THE ZERO HASH SERVICES, AND NO SUCH PARTY SHALL HAVE ANY LIABILITY TO PLATFORM OPERATOR OTHER THAN AS EXPRESSLY STATED HEREIN. ZERO HASH DISCLAIMS ANY OBLIGATION TO KEEP THE ZERO HASH SERVICES SECURE OR FREE OF ERRORS OR VIRUSES OR TO MAINTAIN UNINTERRUPTED ACCESS. ZERO HASH AND ITS AFFILIATES, LICENSORS OR THIRD PARTY PROVIDERS SHALL NOT HAVE ANY LIABILITY TO PLATFORM OPERATOR OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, LOSS OF DATA, INDIRECT, SPECIAL OR CONSEQUENTIAL LOSS OR OTHER DAMAGE OR LIABILITY ARISING OUT OF, OR IN CONNECTION WITH, THE PROVISION OR USE OF (OR ANY INABILITY TO USE) THE ZERO HASH SERVICES (INCLUDING DAMAGES INCURRED BY PLATFORM OPERATOR AS A RESULT OF A COUNTERPARTY DEFAULT), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE OR OTHERWISE, EVEN IF ZERO HASH, ITS AFFILIATES, LICENSORS OR THIRD PARTY PROVIDERS HAVE BEEN ADVISED OF THE POSSIBILITY THEREOF. EXCEPT WITH RESPECT TO MISUSE OF ZERO HASH'S INTELLECTUAL PROPERTY, INDEMNIFICATION LIABILITY, FAILURE TO PAY OR BREACH OF CONFIDENTIALITY BY PLATFORM OPERATOR, THE TOTAL MAXIMUM LIABILITY FOR ANY LOSS OR DAMAGES HOWSOEVER CAUSED AND IN RELATION TO ANY CLAIM OR SERIES OF CLAIMS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE FEES CHARGED TO PLATFORM OPERATOR DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE CLAIM. PLATFORM OPERATOR ACKNOWLEDGES AND AGREES THAT THE ZERO HASH SERVICES ARE NOT AND SHALL NOT SERVE AS THE PRIMARY BASIS FOR ANY INVESTMENT OR TRADING DECISIONS MADE BY PLATFORM OPERATOR AND THAT ZERO HASH IS NOT AN ADVISOR OR FIDUCIARY OF PLATFORM OPERATOR.

PLATFORM OPERATOR ACKNOWLEDGES THAT INFORMATION PLATFORM OPERATOR STORES OR TRANSFERS THROUGH ZERO HASH SERVICES MAY BECOME IRRETRIEVABLY LOST OR CORRUPTED OR TEMPORARILY UNAVAILABLE DUE TO A VARIETY OF CAUSES, INCLUDING SOFTWARE FAILURES, VIRUSES OR OTHER HARMFUL MATERIALS, PROTOCOL CHANGES BY THIRD PARTY PROVIDERS, INTERNET OUTAGES, FORCE MAJEURE EVENTS OR OTHER DISASTERS, SCHEDULED OR UNSCHEDULED MAINTENANCE, OR OTHER CAUSES EITHER WITHIN OR OUTSIDE ZERO HASH'S CONTROL. PLATFORM OPERATOR IS SOLELY RESPONSIBLE FOR BACKING UP AND MAINTAINING DUPLICATE COPIES OF ANY INFORMATION PLATFORM OPERATOR STORES OR TRANSFERS THROUGH ZERO HASH SERVICES.

# 10.  Indemnification

## 10.1. Indemnification by Zero Hash

Zero Hash shall indemnify and defend Platform Operator against any claim, as stated in a lawsuit, that arises directly from the Zero Hash Services, when accessed and used as permitted by this Agreement, infringing upon any issued United States patent or copyright, provided that Platform Operator:

1.  Immediately notifies Zero Hash upon receipt of notice of such claim;

2.  Allows Zero Hash to have sole control of the defense and selection of counsel;

3.  Allows Zero Hash to settle the matter; and



4.   Fully cooperates with Zero Hash in such defense at Platform Operator's own expense.

The foregoing indemnity shall be limited to damages awarded by a court in the United States of competent jurisdiction and there shall be no indemnity for lost profits, indirect, punitive, consequential or exemplary damages. Further, claims for indemnity and defense may be brought by Platform Operator only during the term of this Agreement and for one year thereafter.

The indemnity and right to defense provided by this section shall be null and void to the extent or in the event that:

1.   The Zero Hash Services are not used in accordance with the terms of this Agreement;

2.   The Zero Hash Services are modified in any way by Platform Operator;

3.   Platform Operator willfully infringes on any intellectual property right; or

4.   The claim is based upon any functionality or specification requested by Platform Operator or developed with Platform Operator's input.

Furthermore, in the event such indemnified claim arises, Zero Hash, at its discretion, may:

1.   Obtain rights to the intellectual property infringed upon;

2.   Obtain materially similar functionality for the Zero Hash Services; or

3.   Terminate this Agreement.

Zero Hash has no further obligation to indemnify Platform Operator with respect to this or any other matter.

In the event that Zero Hash is determined to be liable to Platform Operator for any cause, Platform Operator expressly agrees that Zero Hash's aggregate liability, for all causes of action, will not exceed the total commissions, fees and other amounts (excluding any applicable taxes or duties) paid to Zero Hash by Platform Operator in the six months immediately preceding the date of the occurrence of the liability.

## 10.2. Indemnification by Platform Operator

Platform Operator shall indemnify, protect, and hold harmless Zero Hash, its directors, officers, affiliates, employees and agents from and against any and all losses, liabilities, judgments, suits, actions, proceedings, claims, damages, costs (including attorney's fees) resulting from or arising out of any act or omission by any person obtaining access to the Zero Hash Services with a User ID assigned to Platform Operator (other than through the fault or negligence of Zero Hash), whether or not Platform Operator has authorized such access.

# 11.  Governing Law

The laws of the State of Illinois shall govern this Agreement without giving effect to the choice of law provisions thereof. Platform Operator and Zero Hash each agree to submit to the jurisdiction of the state or federal courts of Illinois and each of the Parties waives all rights to bring a motion for inconvenient forum or otherwise challenge the jurisdiction of such courts.

# 12.  Confidentiality

Any and all non-public information in any form obtained by a party ("**Receiving Party**") or its employees arising out of or related to the provision or use of the Zero Hash Services, including but not limited to trade secrets, processes, computer software and other proprietary data, research, information or documentation related thereto, including but not limited to Platform Protocol, shall be deemed to be confidential information ("**Confidential Information**"). Each party agrees to hold such information in strict confidence and not to disclose such information to third parties (other than to its employees, its affiliates and their employees or its agents) or to use such information for any purpose whatsoever except as permitted by this Agreement or as expressly authorized in writing by the other party ("**Disclosing Party**"). Each party agrees to hold such information in strict confidence and comply by this Agreement and to advise each of its employees, affiliates

Zero Hash LLC Platform Operator Agreement 

and agents who may be exposed to such proprietary and confidential information of their obligations to keep such information confidential in accordance with this section.

The confidentiality obligations set forth herein shall not apply to information disclosed by the Disclosing Party that the Receiving Party can prove by competent and admissible evidence: (i) is or has become generally publicly known through no fault of the Receiving Party, (ii) was in its possession or known by it, without restriction, prior to receipt from the Disclosing Party, (iii) was rightfully disclosed to it by a third party without restriction under the Applicable Law, (iv) was independently developed without use of or access to any Confidential Information of the Disclosing Party, or (v) was required to be disclosed by a subpoena or order of a court or regulatory, self-regulatory or legislative body of competent jurisdiction, provided that the Receiving Party has promptly notified the Disclosing Party about such requirement to the extent it is legally permitted to do so, has attempted to limit such disclosure and to obtain confidential treatment or a protective order or other similar relief, and has allowed the Disclosing Party to participate in any such undertakings and proceedings. If requested by Disclosing Party, Receiving Party will formally request that any governmental entity treat the information provided as confidential, to the extent it is not already treated as such, pursuant to the U.S. Freedom of Information Act or pursuant to an equivalent or comparable law or regulation, if applicable.

Each party shall use at least the same degree of care to protect the Disclosing Party's Confidential Information as it uses to protect its own confidential information of like nature, but in no circumstances less than reasonable care. Platform Operator will be solely responsible for controlling and monitoring the disclosure of its Confidential Information and shall limit such information only to authorized persons or receiving parties. Zero Hash shall maintain such information as required by Applicable Law and shall not be liable for the privacy of any such content stored on Zero Hash's equipment, transmitted over networks accessed by the Platform, or otherwise connected with Platform Operator's use of the Zero Hash Services. Zero Hash shall not be liable for the loss, corruption of, or incompleteness, of data, content, or any other information provided to Zero Hash or downloaded to the Platform by Platform Operator, and Zero Hash shall not be liable for the accuracy or veracity of the information or content provided by the Zero Hash Services.

# 13. Term and Termination

## 13.1. Term

This Agreement shall commence on the Effective Date and shall continue in effect for three years (the "**Initial Term**") unless terminated prior in accordance with the terms herein. Thereafter, this Agreement shall automatically renew for one or more further one-year consecutive terms ("**Renewal Term**") unless terminated by either party giving written notice not less than 60 days ("**Notice Period**") prior to the end of the Initial or Renewal Term.

## 13.2. Termination

This Agreement may be terminated for cause immediately by a Party in the event that the other Party: (1) materially breaches this Agreement (e.g., failure to pay) and such breach remains uncured for 10 days after receiving written notice; (2) is the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors; or (3) is the subject of a proceeding for the appointment of a receiver, trustee or similar officer. This Agreement may also be terminated earlier if agreed by both parties, or after eighteen (18) full months from the date of this Agreement, if either party provides a 90-day written notice of termination.

Upon termination of this Agreement: (1) Platform Operator's right to access and/or use Zero Hash Services as described herein shall cease; (2) Platform Operator shall cease to use all copies of any Zero Hash product, software or documentation; and (3) Platform Operator shall return to Zero Hash all copies of said material in Platform Operator's possession, custody or control. Platform Operator will follow reasonable instructions from Zero Hash as to the time, place and manner for return of the foregoing.

Amounts due under Section 7 and as set forth in Schedule A shall survive Termination due to Platform Operator's material breach of this Agreement. In the case of material breach by Platform Operator, Platform

Zero Hash LLC Platform Operator Agreement



Operator shall immediately owe Zero Hash all amounts due through the remaining term as set forth in Section 13.1 above.

# 14. Assignment

This Agreement may not be assigned by either party without the other party's express prior written consent; provided, however, that:

1.  Platform Operator may assign this Agreement to any entity:

    a.  controlling, controlled by, or under common control with such party; or

    b.  which succeeds to all or substantially all of the assets and business of such party, provided that, in the case of any such assignment by Platform Operator, the assignee agrees in writing to assume the assignor's obligations under, and to be bound by the provisions of, this Agreement (as it may be amended from time to time); and

2.  Zero Hash may assign all or part of its rights and obligations under this Agreement to any entity:

    a.  controlling, controlled by, or under common control with Zero Hash; or

    b.  which succeeds to all or substantially all of the assets and business of Zero Hash, provided that, in the case of any such assignment by Zero Hash, the assignee agrees in writing to assume the obligations under, and to be bound by the provisions of, this Agreement that have been assigned.

On the effective date of any valid assignment pursuant to this section, the assignor shall be released from all obligations and liabilities arising under this Agreement or, in case of a partial assignment by Zero Hash, from all obligations and liabilities arising from the parts of this Agreement that have been assigned. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns in accordance with its terms.

# 15. Miscellaneous

1.  <u>Entire Agreement</u>. With exception of the Authorized Delegate Agreement, this Agreement constitutes the entire agreement between the Parties for the Zero Hash Services and supersedes all proposals, negotiations and discussions, oral or written, relating to access to and use of the Zero Hash Services. For any and all conflicts between this Agreement and the Authorized Delegate Agreement, the parties agree that the terms of the Authorized Delegate Agreement will be the controlling agreement.

2.  <u>Waiver</u>. The failure of either Party to exercise in any respect any right provided for herein shall not be deemed a waiver of any further rights hereunder.

3.  <u>Severability</u>. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

4.  <u>Notices</u>. Each and every notice and consent required or otherwise given or made under this Agreement shall be in writing, and shall be deemed given or made when personally delivered, when sent by confirmed fax, electronic mail, or three days after being sent by prepaid certified or registered mail to the last known address or fax number of the party; provided, however, that Zero Hash may provide notices to Platform Operator electronically.

5.  <u>Headings</u>. The headings and captions used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.  <u>Governing Law</u>. Unless otherwise specified, this Agreement is deemed entered into in New York, New York, and shall be governed and construed in all respects by the laws of the State of New York, without giving effect to principles of conflict of law.

7.  <u>No Employees</u>. Neither party shall be deemed to be an employee, agent, partner or legal representative of the other for any purpose, and neither shall have any right, power, or authority to create any obligation or responsibility on behalf of the other.

DocuSign Envelope ID: 4218AD69-B51F-45DA-9564-2F1514273DE6

Zero Hash LLC Platform Operator Agreement



8. <u>Force Majeure</u>. Neither Zero Hash nor Platform Operator shall have any liability for any failure to perform or delay in performing its obligations under this Agreement due to any Act of God, act of governmental authority, change in law or regulation, war, criminal act, fire, explosion, earthquake, flood, weather condition, power failure, transportation or other accident beyond the reasonable control of the party.

9. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and all of such counterparts shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) or by facsimile transmission shall be effective as delivery of a manually executed original counterpart of this Agreement.

10. <u>Survival</u>. The obligations contained in items 7, 8, 9 and 10 of this section shall survive the termination or expiration of this Agreement.

EACH PARTY RECOGNIZES AND AGREES THAT THE WARRANTY AND LIABILITY DISCLAIMERS AND REMEDY LIMITATIONS IN THIS AGREEMENT ARE A MATERIAL BARGAINED FOR BASIS OF THIS AGREEMENT AND THAT THEY HAVE BEEN TAKEN INTO ACCOUNT AND REFLECTED IN DETERMINING THE CONSIDERATION TO BE GIVEN BY EACH PARTY UNDER THIS AGREEMENT AND IN THE DECISION BY EACH PARTY TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates indicated below:

ZERO HASH

By: _Edward Woodford_____

Name: _Edward Woodford_____

Date: _3/16/2020_____

PLATFORM OPERATOR

By _Nil Bergquist_____

Name: _Neil Bergquist_____

Date: _3/16/2020_____

DocuSign Envelope ID: 4218AD69-B51F-45DA-9564-2F1514273DE6

Zero Hash LLC Platform Operator Agreement



# Schedule A – Zero Hash Fees

1. **Settlement Fee:** For the first three full months after the Effective Date, Platform Operator shall owe Zero Hash, each month, a 1% percentage of the notional value of the Transactions reported to Zero Hash, thereafter Platform operator shall owe Zero Hash, each month, a 0.5% percentage of the notional value of the Transactions reported to Zero Hash. Platform Operator shall remit the total principal and fees collected from each Participant to Zero Hash in accordance with the Zero Hash Authorized Delegate Agreement.

2. **Digital Asset Withdrawal Fee**: Zero Hash does not charge Participants a deposit or withdrawal fee for Digital Assets, provided however, Zero Hash reserves the right to begin charging a Digital Asset deposit or withdrawal fee upon thirty (30) business days' notice to Participant if Zero Hash, in its sole discretion, determines that the number of Participant withdrawals during any period becomes excessive. Moreover, Zero Hash reserves the right to begin charging a Digital Asset deposit or withdrawal fee upon thirty (30) days' notice to Customer for any reason. Zero Hash shall not be responsible for any blockchain fee charged by the applicable Digital Asset protocol when Customer or Platform Operator withdraws Digital Assets from the Zero Hash Platform to an External Address.

3. **Minimum Platform Access Fee Charge**: The Platform Operator shall pay a minimum platform access fee charge (the "**Minimum Fee**") if the total notional value of the Transactions does not reach a certain predetermined volume.

   For the first three (3) full months after the Execution Date, the assessed fee rate shall be 100 basis points. If the total notional value of the Transactions reported to Zero Hash by Platform Operator is less than $500,000 a month, Platform Operator shall pay Zero Hash a Minimum Fee of $5,000 each month which shall be inclusive of any fees paid to Zero Hash by the Platform Operator for such month. For example, if the notional value of the Transactions reported by the Platform Operator is $400,000, for which the assessed Settlement Fee is $4,000, then the Platform Operator would be assessed an additional fee of $1,000 to meet the Minimum Fee of $5,000 for such month.

   For months four (4) through six (6) after the Execution Date, the assessed fee rate will be 50 basis points. If the total notional value of the Transactions reported to Zero Hash by Platform Operator is less than $1,500,000 a month, Platform Operator shall pay Zero Hash a Minimum Fee of $7,500 each month which shall be inclusive of any fees paid to Zero Hash by the Platform Operator for such month.

   After the first six months, the assessed fee rate shall be 50 basis points. If the total notional Transactions reported to Zero Hash by Platform Operator is less than $2,000,000 a month, Platform Operator shall pay Zero Hash a Minimum Fee of $10,000 for that month, which shall be inclusive of any fees paid to Zero Hash by the Platform Operator for such month.

   Platform Operator shall prepay the Minimum Fee in three (3) month increments for the first six (6) months after the Execution Date and in one month increments thereafter, with the first prepayment due prior to the launch date of the Zero Hash service on Platform Operator's platform. Prepaid monthly Minimum Platform Access fees shall be credited to Platform Operator for each month, and Zero Hash shall remit to Platform Operator any fees collected for itself under this Agreement or the Zero Hash Delegate Agreement monthly up to the monthly Minimum Settlement Fee monthly, and Zero Hash shall only retain those fees collected in excess of the monthly Minimum Settlement Fee. For the avoidance of doubt, all monthly Platform Access Fee Charges are assessed on a per month basis and exceeding the Platform Access Fee Charge in one month shall have no effect on Platform Operator's Platform Access Fee Charge in any other month.

DocuSign Envelope ID: 4218AD69-B51F-46DA-9564-2E1514273DE6

Zero Hash LLC Platform Operator Agreement



# Appendix A

Zero Hash shall deliver to Platform Operator a software solution that permits Platform Operator to utilize the Zero Hash Services

**Retrieve Participants**: Provides the Platform Operator a list of participant codes that refer to Customers.

**Retrieve a User's Participants**: Provides the Platform Operator a list of participant codes for which a particular user is associated and has trading privileges. The user must be associated with a Customer, and the participant codes returned will also be only those that are also Customers.

**Retrieve a Participant's Users**: Provides a list of users associated with a Customer.

**Submit Trade Reports**: Allows the Platform Operator to post executed trades to Zero Hash.

**Retrieve Submitted Trade Report Status**: Provides the Platform Operator information on previously submitted trades, as well as information on the status of settlement.

Zero Hash LLC Platform Operator Agreement

**zero#**

# Appendix B

- Business Plan
- List of All Physical Locations
- BSA/AML Policy
- Detailed Flow of Funds
- Audited and Unaudited Financial Statements
- Financial and Business Projections